## THE STATE v. MAUPIN, Appellant.

**Division Two, May 22, 1906.**

1. **SERVICE OF INFORMATION: Waiver.** The record recites that "defendant being served by the clerk of this court with a true copy of the information herein filed by the prosecuting attorney waives all exceptions as to time;" and thereupon the case was continued until the next term of court. Defendant did not object to the alleged failure to serve him with a true copy of the information, but entered his plea of not guilty and went to trial. *Held*, that, if there was any defect in the service of the information, defendant waived the same.

2. **MURDER: Mutual Combat: Deadly Weapon.** When parties engage in a mutual combat, under color of fighting upon equal terms, and one of them, without the knowledge of the other, uses, from the beginning of the combat, a deadly weapon, and kills, or when, at the beginning, he prepares a deadly weapon, so as to have the power of using it in some part of the combat, and does use it, and kills the other party with it, the killing will amount to murder.

3. ————: ————: **Sufficiency of Evidence.** Evidence *held* sufficient to justify a verdict of murder in the second degree, committed by one of the parties to a mutual combat.

4. **CLOSING CASE: Absent Witnesses: Defendant's Neglect: No Exception.** When the State had closed its case in rebuttal, defendant objected to the court's closing the evidence at that point, for the reason that he had other witnesses whom he desired to offer, but could not because they were not in the courtroom. The court was not advised who the witnesses were nor upon what point they were to be called in rebuttal, and no exception was saved to the action of the court in closing the case. Moreover, defendant's affidavit discloses that he was informed during the trial that one of these absent witnesses would contradict witnesses who had testified for the State, and yet he took no steps to procure a subpoena for such witness, nor does it appear that he ever interrogated him as to what his testimony would be. *Held*, that, under these circumstances, the court committed no error in closing the case.

5. **INSTRUCTIONS: Reasonable Doubt: Good Character: Self-Defense: Defendant as Witness.** Instructions on reasonable doubt, defendant's good character, the right of self-defense, and the weight to be given to defendant's testimony, *held* to correctly state the law on those subjects.

State v. Maupin.

6. ——: Refusing Defendant's. No error is committed in refusing instructions requested by defendant when the points therein presented have been covered by instructions already given.

7. ——: Presumption of Innocence: Reasonable Doubt. It is not reversible error to refuse an instruction stating the presumption of innocence when the court has already fully instructed on the subject of reasonable doubt.

8. ——: On Manslaughter: No Evidence: No Request or Exception. If defendant desired an instruction on manslaughter, he should have requested it, and excepted to the failure or refusal of the court to give it, and then made this a ground of the motion for new trial, and having failed to do so, the point is not before the appellate court for review. And in this case it is held that the evidence would not have justified the giving of an instruction on manslaughter.

Appeal from Taney Circuit Court.—*Hon. Jno. T. Moore*, Judge.

AFFIRMED.

*Price & Ford* for appellant.

(1) The copy of the information as served upon defendant was not certified to by the clerk of the court, and for that reason gave no notice to him of the charge against him. R. S. 1899, sec. 2558; State v. Schmidt, 137 Mo. 266. (2) The verdict is against the evidence. (3) The court erred in allowing important witnesses for defendant to leave and be sent away during the session of the court, and in refusing to allow defendant time in which to secure their testimony. (4) The failure of the court to give an instruction for manslaughter in the fourth degree is reversible error.

*Herbert S. Hadley*, Attorney-General, and *N. T. Gentry*, Assistant Attorney-General, for the State.

(1) The rule of practice has been to require a defendant to preserve in the record a failure to serve him with a true copy of the indictment or information; otherwise the point is waived. And when a de-

fendant enters his plea of not guilty and goes to trial, he thereby waives the service of a copy of the indictment or information.  State v. Schmidt, 137 Mo. 269; State v. Nelson, 132 Mo. 196.  (2)  "If a party, under color of fighting upon equal terms, use from the beginning of the contest a deadly weapon without the knowledge of the other party, and kill the other party with such weapon; or if at the beginning of the contest he prepare a deadly weapon, so as to have the power of using it in some part of the contest, and use it accordingly in the course of the combat, and kill the other party with the weapon; the killing in both these cases will be murder."  1 Wharton's Crim. Law (10 Ed.), sec. 474; 1 Bishop's New Crim. Law, sec. 842; 1 Russell on Crimes, 529, 531; State v. Christian, 66 Mo. 138.  (3)  Defendant is in no position to complain of the action of the trial court in closing the case at the time it did.  After the defendant had closed his case, the State offered only two witnesses, who testified in rebuttal.  Defendant made no statement of what he expected to prove by the absent witnesses; hence, this court cannot tell whether the evidence would have been relevant or irrelevant, material or immaterial. State v. Strattman, 100 Mo. 540.  Again, defendant, in his application, did not state the names of said witnesses, nor that he had used any diligence to procure the attendance of said witnesses; so of course the court could not have given him additional time to have process issued, the witnesses served and their attendance procured. State v. Mitchell, 98 Mo. 657.  (4)  No error was committed by the court in failing to instruct the jury on the subject of manslaughter.  But even if error was committed, defendant has waived it by failing to make any objections to such failure at the time; and also by failing to call the court's attention to such alleged failure in the motion for a new trial.  State v. Cantlin, 118 Mo. 111; State v. Albright, 144 Mo. 638; State v. McGinnis, 158 Mo. 105; State v. Ferguson, 162 Mo. 668.

GANTT, J.—At the April term, 1905, of the circuit court of Taney county, the prosecuting attorney of that county filed an information, duly verified, charging the defendant with murder in the first degree of one Charles Knight, on the 7th of February, 1905, at said county. At the June term, 1905, the defendant was tried and convicted of murder in the second degree, and his punishment assessed at twelve years in the penitentiary. In due time he filed his motions for new trial and in arrest of judgment, which being overruled, he was sentenced in accordance with the verdict, and from that sentence he appeals.

The State's evidence tended to show that on the night of February 7, 1905, there was a dance at the home of Jeff Clayton, near the town of Hercules, in Taney county. The defendant and the deceased went to this dance. The defendant was the escort of Miss Bertha Wright, and the deceased of another young lady. The evidence shows that the deceased and other young men were drinking considerably that night, though there had been no other trouble. During the evening, the deceased and the defendant were standing facing each other in front of the fireplace. Deceased said to defendant that he was a better man than defendant was, to which defendant replied that he would have to be shown; deceased then stated that if defendant would go out of the house, he (deceased) would show him, and defendant said he would go any place; and in a moment both of them went out of the front door into the yard, defendant going first. As defendant turned and started toward the door, he put his hand in his pocket, and when they reached the yard, the evidence for the State tends to show that before deceased had made any movement towards the defendant, defendant took hold of the deceased by the collar and struck him on the neck, and then hit him six or seven times, the deceased striking back. The defendant then threw the deceased towards the gate, or as expressed by one wit-

ness, he "slung" deceased toward the gate, deceased going in a stooped-over position. While standing near the gate, the deceased fired three shots from a pistol; defendant at that time was running around the corner of the house. Deceased then exclaimed, "Ward [the defendant] has cut me all to pieces." He then walked back to the front door and fell, and it was discovered that he had been stabbed on the neck and back. He was carried into the house, and died in a few minutes, before the physician could be summoned. An examination of his body disclosed that there were six wounds, all inflicted with a knife, one of which was a gash on the neck, which severed the jugular vein, and doubtless produced his death.

On behalf of the defendant, the evidence tended to prove that the deceased had asked Miss Mary Burns to go with him to the dance, but she declined; he insisted, saying that it was his last dance in Taney county, that if she did not go, she would wish that she had gone, as something was going to happen. It also appeared in evidence that on the day prior to the dance, deceased stated to one John Howard, that he (deceased) was going to said dance to make the people dance when he said dance and to run things. That he was going to leave the county, and was going to lick somebody, or get a licking. That deceased carried a pistol the night of the dance, and he objected to Miss Maud Cranfield dancing with George Adamson, and said that he would shoot Adamson if she danced with him. It appeared that on the Sunday before the dance, defendant and deceased called together at the home of a Miss Bertha Wright, and a Miss Dinah Robins was there. The defendant spent most of his time talking to Miss Wright, and the deceased to Miss Robins; that when defendant and Miss Wright entered the room, deceased was lying on the bed; and Miss Wright said if he didn't get up she would whip him. This familiarity displeased the defendant, and he told Miss Wright she could take

her choice, either talk to him or to the deceased, and he guessed he would quit, and she promptly replied that there were other boys for her to talk to and his quitting was all right. When this conversation was reported to the deceased, he said it did him more good than anything, and laughed heartily. On the night of the dance, the deceased came to Miss Wright and asked her if he could beat that fellow's time, and upon receiving a negative reply, deceased said to her, if I can't take her home, Ward Maupin can't either. The defendant's evidence further tended to show that after the conversation in front of the fireplace, defendant and deceased went out of the house and the deceased began cursing and threatening to kill defendant; that deceased grabbed hold of the defendant's collar and struck him twice; that after a scramble between them defendant turned and ran, and deceased shot at him three times.

The defendant testified, in his own behalf, that deceased was standing by the fire and he walked up to him and deceased began talking about Bertha Wright and he said he could beat my time, and I told him "all right he could do it to-night if he wanted to," and he said, "No, I would not do it to save your life." He then said, "If you had not passed me to-night, I would take you out and beat h— out of you," and I said, "I don't know whether you would or not," and he said, "If you go out doors I will show you," and I said, "Now, there is no use of us having any trouble," and he said, "Don't get mad," and gave me a shove on the shoulder, and when we got into the yard, he took hold of my coat collar and said," You know I can beat h— out of you," and he took hold of my coat collar and struck at me and reached his hand in his pocket, and when he did that, I put my hand in my pocket and got my knife and went to cutting. He got his revolver and shot at me, and I stooped down to the ground and he shot over me. Defendant identified the knife with

which he did the cutting. He testified that he went out
doors because deceased ordered him out. There was
evidence also that defendant went to his home that
night, but did not stay there, and could not be arrested
for several days, but on the following Tuesday he gave
himself up to the deputy sheriff. There was also evi-
dence to the effect that the defendant had a good repu-
tation as a peaceable and law-abiding citizen.

In rebuttal, the State proved by two witnesses that
defendant's witness, Charles Carlyle, was not near the
defendant and the deceased at the time of the dif-
ficulty, but was in another room. At the close of the
State's evidence in rebuttal, the record recites: "The
defendant objects to the court closing this case for the
reason that there was evidence in rebuttal which they
purpose to offer, but cannot on account of the witness
not being in the court room. Thereupon the case closed
and the court proceeded to instruct the jury."

The court instructed the jury on murder in the first
degree and defined the terms willfully, deliberately,
premeditatedly, malice, and malice aforethought. The
court also instructed on reasonable doubt, previous
good character of the defendant, credibility of wit-
nesses, and self-defense. The defendant prayed the
court to give eight instructions, which the court refused,
and the defendant saved his exceptions to the giving
of those on behalf of the State and to the refusal of
those prayed by his counsel. Various errors are assign-
ed for a reversal of the judgment of the circuit court,
and these will be considered in the order of defendant's
brief.

I. The point is made that the copy of the informa-
tion served upon the defendant was not certified by
the clerk of the court. In support of this proposition,
we are cited to the case of State v. Schmidt, 137 Mo.
269. There can be no doubt under our statute that a
defendant charged with murder in the first degree is
entitled to a copy of the information before he is re-

quired to plead. And the record in this case shows that the information was filed at the April term, 1905. And the record recites that on the 27th of April, the prosecuting attorney appeared on behalf of the State as also the defendant in his own proper person as well as by his attorney, ''and the defendant being served by the clerk of this court with a true copy of the information herein filed by the prosecuting attorney waives all exceptions as to time.'' And thereupon the cause was continued until the next term of the court. No objection appeared to have been made by the defendant to the failure to serve him with a true copy of the information and he entered his plea of not guilty and went to trial thereon. By so doing he waived the service of the information, if there had in fact been any failure in this respect. [State v. Schmidt, 137 Mo. 269; State v. Nelson, 132 Mo. l. c. 196.]

II. It is next insisted that the verdict of the jury is against the evidence. As to this it is sufficient to say that there was a direct conflict between the evidence for the State and that for the defendant. It may be conceded that if all of the defendant's testimony was true, and the jury had believed it, the verdict might well have been one of acquittal, but the evidence was a matter for the consideration of the jury, and by their verdict it is evident that the jury did not believe the testimony for the defendant and his witness Carlyle, and this was the province of the jury. It is evident, moreover, that there was more or less ill feeling between the defendant and the deceased over the witness Miss Wright. The evidence on behalf of the State indicates that before the deceased had struck or attempted to strike the defendant, after they had retired to the yard to settle the question of their physical power, the defendant began to strike the deceased about the neck and shoulders; and it was subsequently developed that these blows were made by a knife and resulted in the death of the deceased. In State v. Underwood, 57 Mo. l. c.

50, Judge WAGNER, speaking for the court, said: "The 9th instruction is predicated upon the hypothesis that there was a mutual and voluntary combat. If that was so, defendant could not rely upon self-defense. For where parties by mutual understanding engage in a conflict and death ensues to either, the slayer will be guilty of murder." And in State v. Christian, 66 Mo. l. c. 147, this court again said: "It was also held in the case of the State v. Underwood, 57 Mo. 40, that when parties by mutual understanding engage in the conflict and death ensues to either, the slayer will be guilty of murder. When the combat is the immediate consequence of a sudden quarrel, and not an act of deliberation or agreement, it might be different; but even in cases of this kind the conclusion of malice may be reached if the party killing began the attack with circumstances of undue advantage. When a party, under color of fighting upon equal terms, uses, from the beginning of the contest, a deadly weapon, without the knowledge of the other, and kills, or when, at the beginning, he prepares a deadly weapon, so as to have the power of using it in some part of the contest, and does use it, and kills the other party with it, the killing will amount to murder. [1 Russell on Crimes, 529, 531.]" This last statement of the law is approved by Wharton in his work on Criminal Law (10 Ed.), sec. 474. In view of these statements of the law, can it be said there was not sufficient evidence to sustain the conviction of murder in the second degree? According to the State's witnesses there was a mutual agreement between the deceased and the defendant to engage in the fight, and they went out into the yard for that purpose and the evidence is sufficient to support the conclusion that it was to be a fair fight upon equal terms, but that the defendant under the color of a fist fight prepared his knife with the purpose of using it in the contest, and the evidence on the part of the State tended to prove that he used it from the very beginning

upon the neck and shoulders and back of the deceased,
and from the wounds inflicted with this knife the de-
ceased died. And while the State's evidence showed
this, the evidence on behalf of the defendant also tend-
ed to show that he entered into the fight willingly and
went out of doors for that purpose, and while defendant
says that he did not use his knife until after deceased
had assaulted him, the evidence on the part of the State
tended to prove that the defendant forced the fighting
from the very beginning and the fact that deceased
did draw his pistol and fire at the defendant after the
defendant had stabbed him and inflicted the mortal
wound, does not change the complexion of the case.
Under the rule as announced by Russell, Wharton and
Bishop and by this court in State v. Christian and
State v. Underwood, supra, it cannot in our opinion
be said that the evidence did not justify a verdict of
murder in the second degree.

III. Error is assigned because the witnesses Burris
and the two Lawsons, who had been subpoenaed for the
State, went home and defendant did not have an op-
portunity to place them upon the witness stand after
the State had closed its case in rebuttal. As to this
proposition, the record shows that when the State
closed its case in rebuttal, the defendant objected to
the court closing the evidence at that point for the
reason that the defendant had other witnesses whom
he purposed to offer, but could not because the wit-
nesses were not in the court room. The court was not
advised who the witness or witnesses were, nor upon
what point they were to be called in rebuttal, and no
exception was saved to the action of the court in clos-
ing the case. The point now made that these witnesses
were excused by the sheriff is not supported either by
affidavit of the defendant himself or the witness Burris.
Moreover, the affidavit of the defendant himself dis-
closes that during the trial he was informed that Burris
would contradict the witnesses Mowrey and Morgan,

and yet he took no steps to procure a subpoena for the witness Burris; nor, indeed, does it appear that he ever interrogated Burris as to what his testimony would be. We think it is too plain for argument that the circuit court committed no error in closing the case in these circumstances, but on the contrary if the defendant really wanted the witness, he was guilty of inexcusable negligence in not taking the proper steps to secure the attendance of the witness in his own behalf. [State v. Strattman, 100 Mo. 540; State v. Mitchell, 98 Mo. 657; State v. Raven, 115 Mo. 419; State v. Hilsabeck, 132 Mo. 357.]

IV. In his motion for new trial the defendant assigns as error the giving of instructions 4 to 7 inclusive. Instruction 4 given by the court is in these words: "The court instructs the jury that before you can convict the defendant, you must believe him guilty beyond a reasonable doubt, but a doubt to authorize an acquittal must be a substantial doubt based on the evidence and not a mere possibility of innocence." This instruction is substantially the instruction on reasonable doubt approved in State v. Nueslein, 25 Mo. 111, and State v. Knock, 142 Mo. l. c. 524. Instruction 5 told the jury that the previous good character of the defendant if proved to their reasonable satisfaction ought to be considered by the jury in passing upon the guilt or innocence of the defendant, because the law presumes that a man whose character is good is less likely to commit a crime than one whose character is not good, but if all the evidence in the case, including that which had been given touching the previous good character of the defendant, showed him to be guilty of the charge, then his previous good character could not justify, excuse, palliate or mitigate the offense. This instruction was as favorable as the defendant could ask and has often been approved by this court. Instruction 6 was the usual instruction and

told the jury they were the sole judges of the credibility of the witnesses and the weight and value to be given their testimony. It has been so universally approved that nothing more need be said in regard to it. Instruction 7 was as follows: "The court instructs the jury that the law of self-defense is emphatically the law of necessity, to which the party may have recourse under certain circumstances to prevent any reasonably apprehended great injury which he may have reasonable grounds to believe is about to fall upon him. If you believe that defendant had reasonable cause to apprehend a design on the part of deceased to commit a felony upon defendant or to do him some great personal injury, and that there was reasonable cause to apprehend immediate danger of such design being carried out, and he cut deceased and killed him to prevent the accomplishment of such apprehended design, then the killing is justifiable upon the ground of self-defense, and you should acquit him." The objection to this instruction is based solely upon the fact that the court used the phrase, "that the law of self-defense is emphatically the law of necessity." Read together, it is apparent that the instruction is a correct statement of the law and contains no error which would justify the reversal of the judgment. Instruction 8 is as follows: "The court instructs the jury that the defendant is a competent witness in his own behalf and you may consider his testimony, but in determining what weight and credit you will give his testimony you may take into consideration the fact that he is the defendant on trial and interested in the result of the trial." There was no error in giving this instruction.

The defendant likewise complains of the refusal of certain instructions asked by his counsel. There was no error in refusing the first instruction asked by the defendant on the subject of reasonable doubt and presumption of innocence. This point was fully considered in State v. Kennedy, 154 Mo. l. c. 287, 288

and 289, in which it was held not reversible error to refuse an instruction stating the presumption of innocence when the court had fully instructed on the doctrine of reasonable doubt. [State v. Young, 105 Mo. 640; State v. Harper, 149 Mo. 514.] While a different view was taken by the Supreme Court of the United States in Coffin v. United States, 156 U. S. 432, we adhere to our own decisions upon this proposition.

Again, it is insisted that the court erred in not giving the defendant's instruction 2 in regard to his right to testify in his own behalf. As the court had already properly instructed on this subject, no error was committed in refusing this instruction. Instructions 3, 4 and 5, requested by defendant, declared the law of self-defense. They are each in substance the same as that given by the court of its motion on self-defense, except that they are more elaborate and inform the jury that the danger the defendant apprehended need not have been actual or real and about to fall upon defendant, but it was sufficient if there was reasonable cause on his part to apprehend it, and in the fourth that it was not required of him that he should nicely gauge the amount of force necessary to be used to protect himself from the apprehended danger. These instructions are well enough in a proper case and the defendant is entitled to them if the facts justify them, but we think that in this case the instruction given by the court was all that was necessary to advise the jury on the law of self-defense. Indeed, in view of the testimony there can be no doubt that this was a case of agreed mutual combat and that from the very beginning defendant used his knife on deceased, inflicting a mortal wound from which deceased died. In giving an instruction at all on the subject of self-defense, the court was exceedingly fair to defendant, and he has no ground to complain that the jury found that he was not acting in self-defense, but was using a deadly weapon on his adversary from the start. Instructions must be based upon testimony

and instructions entirely proper in one case frequently have no relevancy in another.

No error was committed in refusing instruction 7, because the court had already instructed on reasonable doubt. Finally, it is now for the first time insisted that the court should have instructed on manslaughter in the fourth degree. No such instruction was asked by defendant and no exception saved to the failure of the court to instruct on all questions of law applicable to the facts of the case. Moreover, the failure to instruct on manslaughter is not made a ground of the motion for new trial, and hence the point is not before us for review, but if it was, we do not think the evidence would have justified it. The judgment must be and is affirmed.

*Burgess, P. J.,* and *Fox., J.,* concur.