THE STATE v. GEORGE GOLDEN, Appellant.—51 S. W. (2d) 91.

Division Two, June 10, 1932.

*Stralton Shartel*, Attorney-General, and *Ray Weightman*, Assistant Attorney-General, for respondent.

HENWOOD, J.—The defendant appealed from a judgment of the Circuit Court of Jasper County, sitting at Joplin, where he was convicted of murder in the first degree and sentenced to imprisonment in the penitentiary for life.

Glen Moss, the victim of the alleged murder, was shot and killed by the defendant in the city of Joplin, in Jasper County, on August 31, 1931. The defendant was then sixty-one years of age, and had been in poor health and in a nervous condition for several years. Moss was twenty-six years of age, and about five feet and ten inches in height, and weighed about one hundred and seventy pounds. The defendant lived on the northeast corner of the intersection of Ninth and Picker streets. in Joplin, where the shooting occurred. Ninth Street runs east and west, and Picker Street runs north and south. The defendant's house faced west on Picker Street, and there was a porch on the southeast part thereof, facing south on Ninth Street. Moss lived on Connor Street, near Ninth Street, three blocks east of Picker Street. In December, 1927, the defendant gave the police officers of Joplin information which lead to the arrest of Moss on a charge of stealing an automobile in Joplin. Moss pleaded guilty to the charge, and was sentenced to imprisonment in the penitentiary for two years, and granted a parole immediately following the sentence.

The defendant's evidence shows that, six or eight months after Moss was prosecuted, "he began annoying" the defendant "about causing him to be sentenced to the penitentiary," and told the defendant he was going to "get even" with him; and that, on numerous occasions, he cursed the defendant, and called him an "old son-of-a-b—," and threatened to "beat" his "head off" and to "stomp" his "head in the ground;" and that, on one occasion, he threatened to "run over" the defendant "with his car;" and that, referring to the defendant, he said to one of the defendant's friends, "I could kill that old son-of-a-b— and beat him to death just the same as though he was a snake." And the State's evidence shows that, about two years before Moss was killed, the defendant said to Moss's brother, "Tell Glen I am going to kill him the next time he crosses my path;" and that, about one year before Moss was killed, on the south side of Ninth Street, opposite the defendant's premises, the defendant pointed a pistol at Moss, and said, "You walk towards me and I will shoot you," and Moss said, "I will walk from you," and Moss "walked from him."

Several of the State's witnesses saw the shooting, and also saw what happened shortly before. From the testimony of these witnesses, we gather the following: From about four o'clock until about five-thirty in the afternoon of August 31, 1931, Moss sat on the front porch of O. F. Harris's house on the north side of Ninth Street, about one block west of the defendant's home, talking to Harris and William Abbott. While Moss was there, the defendant passed there twice, walking along the sidewalk on the north side of Ninth Street from his house to Dayhill's grocery store and from the store back to his house. The store was on the north side of Ninth Street, about

one block west of Harris's house. Upon entering the store, the defendant said to Mr. Dayhill, "I want a loaf of bread, but I really don't need it; I had to have an excuse to come to the store; there is a certain party on Ninth Street; if they don't leave me alone, I am going to clean up on them." Between five-thirty and six o'clock that afternoon, Moss left Harris's house and started east on the north side of Ninth Street, in the direction of his home. While he was walking along the sidewalk on the south side of the defendant's premises, the defendant pointed a pistol at him, and said, "You can't go down my sidewalk; you called me a son-of-a-b—, and anybody that does that can't get away with it." Moss "threw his hands in the air and backed," then turned and walked back to Prall's garage, about a half of block west, on the north side of Ninth Street. Some of the State's witnesses testified that Moss, in replying to the defendant, said, "I will be back in fifteen minutes and I will walk down the sidewalk," and others testified that Moss said to the defendant, "You haven't got nerve enough to fight like a man; I will be back in fifteen minutes." Moss remained at Prall's garage for a few minutes, talking to several residents of the neighborhood, and then started east again, along the sidewalk on the north side of Ninth Street, "with his hands down to his sides." When he reached a point on the sidewalke near the southwest corner of the defendant's premises, the defendant, standing near the side porch of his house and behind a rose trellis, pointed a double-barreled, "12 guage" shotgun at Moss, and shot Moss, while Moss was facing him and "backing away," with "his hands in the air." As Moss turned, facing south, the defendant shot him again with the shotgun, and Moss fell to the sidewalk, mortally wounded, with "three or four hundred shot" in his body. The "whole front part of his body and around his sides were filled with gunshot wounds," and "some in his legs," and "some in one of his arms." While lying on the sidewalk, immediately after he was shot, Moss said to Mrs. Harris, "Oh Mrs. Harris, have I said a word? Have I said a word? I did not do anything, did I?" Immediately after shooting Moss, the defendant reloaded the shotgun. A few minutes later, when the defendant was arrested by a police officer, he said to the officer, "I have done it and ready to go down." At that time, the shotgun was lying across the arms of a chair on the side porch of the defendant's house, and a "38 Colts" revolver was found under the cushion of the chair. Both the shotgun and the revolver were loaded.

The defendant testified, in support of his plea of self-defense: He told Moss's brother that he "wasn't to blame for his (Moss's) troubles," and that he "didn't want to have any trouble with him (Moss) and would like to avoid it," and "there was no threat passed." He had an altercation with Moss and Moss's companions

on the south side of Ninth Street, opposite his premises, when they were indulging in "some slurring talk" about him, but he did not threaten to shoot Moss on that occasion. He went to Dayhill's store and bought a loaf of bread the day of the shooting, but did not say at that time that he "had come there just as an excuse." He did say, "Ninth Street is getting tough," and he was asked what he was going to do "when they got on" him, and replied, "if I can't get away, I will clean them up." Later that afternoon, while he was cutting grass near the south window of his house, Moss came along the sidewalk, and "kinda crouched down like he was going to lunge" at him, and said, "I will stomp you in the ground." He said to Moss, "Stop, or I will hurt you," and pointed his pistol at Moss, "to drive him away," because he "was afraid" Moss was going "to injure" him. When he drew his pistol on Moss, Moss "throwed up his hands, and walked back probably two or three steps," and said, "G—— d—— you, you haven't got nerve enough to fight; I will be back and settle it with you; and I will be back in fifteen minutes;" and Moss went back west on Ninth Street. He then loaded his shotgun, and "laid it" on the edge of his side porch "for the purpose of protecting" himself. In about fifteen minutes, while he was sitting in a chair on his side porch, Moss came back from the west, along the sidewalk, and, upon reaching the southwest corner of his premises, Moss said to him, "G—— d—— you, I have come back to settle with you, and you won't get out of it." He "thought he (Moss) was going to pull a gun," and "got up out of the chair and picked up the shotgun, and fired the first shot at Moss, with Moss facing him, but did not know how he fired the second shot. He was "scared" and "excited," and, when he "come to" himself, he was loading the shotgun again. On cross-examination, he said he thought he saw Moss crossing Ninth Street, "going toward Mr. Harris's," before he went to Dayhill's store, and thought he saw Moss on Harris's porch as he passed there on his way to the store, the day of the shooting; that, later that day, when Moss came along the sidewalk, adjoining his premises, the first time, he had his pistol "in the bosom of his overalls," but did not "know just how" he happened to have it;" that, when Moss came back along there the second time that day, he "shot with the intention of filling him full of shot, so he would leave there;" and that, when he fired the first shot, Moss was "thirty to thirty-five feet" from him, and "his (Moss's) right hand was a little behind him."

Freda Howard, one of the defendant's witnesses, testified that she was standing near the defendant's side porch, talking to the defendant, immediately before the shooting, and that she saw the shooting; that, when Moss came up to the corner of the defendant's

yard, he stepped into the yard, and said to the defendant, "Now listen, we will have this out," and the defendant "got up (from his chair on his side porch) and fired the two shots from his shotgun;" that Moss "had his hands down at his side" when the first shot was fired; and that, immediately after the shooting, Moss said to Mrs. Harris, "It was my fault." On cross-examination, she testified that, before Moss came along, the defendant said to her, "If he (Moss) comes down and starts any excitement, I am ready for him;" that Moss "didn't reach for his pocket" and she "didn't see any weapons in his hands;" that Moss was facing the defendant when the first shot was fired; and that Moss "didn't make any movements or anything like he was going to strike at him or throw anything at him."

Another of the defendant's witnesses, the undertaker testified that, when he undressed Moss at the hospital after the shooting, he found a pair of iron knucks "fastened on his underwear inside," underneath his belt.

No brief has been filed by the defendant. In his motion for a new trial, he complains of the refusal of the trial court to keep all of the qualified jurors in the custody of the sheriff pending the selection of twelve jurors to try the case, and also complains of the admission of certain evidence and of the exclusion of certain evidence, and challenges the sufficiency of the evidence, and asserts that the verdict was the result of passion and prejudice on the part of the jury.

I. With reference to the first complaint, the record shows the following proceedings:

"THEREUPON, during the *voir dire* examination of the jury panel and at the conclusion of the examination of the first twelve jurors so examined, the following proceedings were had, to-wit:

"MR. ANDREWS: That is all I care to ask this panel of twelve. At this time after the qualification of the first twelve, the defendant asks the court that the twelve jurors now on the panel be kept together for the reason there is a large number of witnesses in this case that are circulating through the halls, that are coming in contact with the jurors; just in furtherance of a fair and impartial trial the defendant asks they be kept together.

"THE COURT: In the opinion of the court there is no situation arising to keep the jurors together.

"MR. ANDREWS: Except.

"THE COURT: Gentlemen of the jury, you will be excused until one-thirty. I want to admonish you very particularly and very

cautiously not to overhear any conversation about this case; talk to nobody about it or let anybody talk to you about it or read anything about it. You may go.

"During the *voir dire* examination of the jury panel and at the conclusion of the examination of the second twelve jurors so examined, the following proceedings were had, to-wit:

"MR. ANDREWS: The defendant asks the court to keep the jurors together under charge of the sheriff.

"THE COURT: Overruled.

"MR. ANDREWS: Defendant excepts. . . .

"During the *voir dire* examination of the jury panel and at the conclusion of the examination of the last six jurors so examined, the following proceedings were had, to-wit:

"MR. ANDREWS: The defendant asks the court to keep all the qualified jurors in charge of the sheriff, and in a separate room.

"THE COURT: Overruled.

"MR. ANDREWS: Except.

"THE COURT: Gentlemen of the jury, you may be excused. Do not leave the courthouse and do not overhear anything about this case or talk to one another or read anything about it. Be very careful, gentlemen.

"THEREAFTER, after challenges had been made by the State and defendant, and immediately before the clerk called the names of the twelve jurors selected to try the case, the following proceedings were had, to-wit:

"MR. ANDREWS: Gentlemen, just one question I wish to propound to all of you: Since you were outside I will ask you has any person talked to any of you about this case. (No response.)

"MR. ANDREWS: Thank you, gentlemen."

Section 3678, Revised Statutes 1929, says: "In all felony cases the trial court *may*, of its own motion, or when requested by the attorney for the State or for the defendant, place all jurors found by the court to be competent to sit in the trial of the cause in the custody of an officer or officers of the court until the entire panel shall have been made up and the peremptory challenges shall have been made and the jury sworn to try the cause. . . ." (Italics ours.)

It is apparent at once that, under the provisions of this section, the trial court "*may*," in its discretion, keep all qualified jurors, in felony cases, in the custody of an officer of the court, or permit them to separate, pending the selection and swearing of twelve jurors to try the case, and this court has so held. [State v. Todd, 146 Mo. 295, 47 S. W. 923; State v. Fox, 300 S. W. 820.]

In this instance, the trial court found, and expressed the opinion, that there was "no situation arising to keep the jurors together," and, in the exercise of its discretion, permitted the thirty qualified jurors to separate, under a special admonition against any improper conduct on their part, until twelve jurors were selected and sworn to try the case. There is nothing to indicate that such separation of the qualified jurors was in anywise prejudicial to the defendant. Indeed, it affirmatively appears that none of the qualified jurors talked to any person about the case during such separation. On the record before us, it cannot justly be said that the trial court abused its discretion in this particular.

II. Complaint is made of the following alleged "reexamination" of the State's witness William Abbott:

"Q. Now, you tell the court just what you saw or heard? A. Well, I seen him go down that way, and then I seen him again, he had his hands up kind of like that, looked like he was backing away from Mr. Golden, and I heard the shots.

"Q. Now, where was Glen at the time he had his hands up? A. Well, he was about the corner there.

"Q. Had he stepped up onto the sidewalk?"

It would suffice to say that the record does not show such questions or answers, or that any objection was made to similar questions or answers, in either the direct or redirect examination of this witness. However, it may be well to add that an examination of this witness such as the alleged examination would have been proper, in view of his testimony that he was looking at Moss at the time and immediately before he was shot.

III. Complaint is also made of the exclusion of the proffered testimony of the defendant and two of his witnesses relating to statements made by the defendant to said witnesses as to threats of Moss against him. Such statements of the defendant were self-serving, and the proffered testimony relating thereto was properly excluded on that ground. [State v. Atchley, 186 Mo. 174, 84 S. W. 984; State v. Lovelace (Mo. Sup.), 39 S. W. (2d) 533.]

IV. There is no merit in the challenge of the sufficiency of the evidence. The State's evidence shows that, about two years before the shooting, the defendant threatened to kill Moss; that, about one year before the shooting and again about fifteen minutes before the shooting, he pointed a pistol at Moss and threatened to shoot him; that he shot Moss with a double-barreled shotgun, the first time, while Moss was facing him and "backing away," with "his hands

in the air;'' and that he shot Moss, the second time, as Moss turned, with his side and back toward him (the defendant). According to the defendant's own testimony, Moss was ''thirty to thirty-five feet'' from him when he fired the first shot. And, according to the testimony of the defendant's witness Freda Howard, she was looking at Moss when the first shot was fired, and she ''didn't see any weapons in his hands,'' and he ''didn't make any movements or anything like he was going to strike at him (the defendant) or throw anything at him (the defendant).'' This evidence, in connection with the other evidence hereinabove stated, made a clear case for the jury on the issue of murder in the first degree, and the evidence as a whole is amply sufficient to support the verdict of the jury. [See discussion of the evidence in State v. Jenkins, 327 Mo. l. c. 332, 37 S. W. (2d) l. c. 435.]

V. The record discloses no proof that the jury were influenced by passion and prejudice. The mere assertion to that effect in the motion for a new trial, in the absence of proof, is without avail.

We have carefully examined the record proper and find no error. The information, verdict and judgment are in approved form.

The judgment is affirmed. All concur.