STATE v. DAVE CAVENER, Appellant.—No. 39912.—202 S. W. (2d) 869.

Division One, June 9, 1947.

*Roy Coyne* and *James A. Cooley* for appellant.

*J. E. Taylor,* Attorney General, and *W. Brady Duncan,* Assistant Attorney General, for respondent.

604

BRADLEY, C.—Defendant was charged by information with murder in the first degree; convicted of murder in the second degree; sentenced, in accordance with the verdict, to a term of 25 years in the penitentiary, and appealed.

Error is assigned: (1) On the admission and exclusion of evidence; (2) on instructions 2, 4, 6, and 7; and (3) on the ground that the evidence does not justify the verdict, and that the punishment assessed by the jury shows bias and prejudice of the jury against defendant.

In the early morning of July 3, 1945, shortly after midnight, defendant shot and killed Tom Morrison in the City of Joplin. The deceased was 75 years old and defendant 65. Defendant had resided in Joplin 43 years; was a miner for 38 years, and had known deceased for 43 years. Deceased had been an officer for 39 years, and was on the regular police force for 7 years. Both, at the time of the shooting, were merchant police, that is, they were employed for night service by merchants to look after the business places of those who employed them. A part of this service was to act as guard to an employee when the employee went to the bank at night to make deposits. They repre-

sented different employers and had no service in common. Each had a commission for merchant police service from the proper authorities. They went armed while on duty, and both had been in the merchant police service for a number of years. They used an automobile in visiting the different places they were employed to look after, and defendant for four years had usually kept his shotgun in his car when on duty, and he also carried a pistol in a holster. Deceased also carried a pistol in a holster.

Defendant's evidence tended to show that deceased, on occasions, accused defendant of encroaching on the territory of the deceased, that is, on what is termed his beat, and because of this, ill feeling was created between them. Also, defendant's evidence tended to show that deceased, on several occasions, threatened to kill defendant. and many of these threats were communicated to defendant. Defendant testified (corroboration by others) to an occasion when deceased threatened to kill him, followed him to his (defendant's) car and kicked him and said, ''You son of a bitch, pull your gun. I'll beat you to the draw. I'll kill you.'' On another occasion (corroborated by others) defendant said deceased ran him into a car lot office; kept him there for about an hour; said, ''Come out you son of a bitch; I am going to kill you.'' It could serve no purpose here to detail the evidence as to all the various threats.

Defendant shot deceased, one shot, with a 12 guage double barrel shotgun, No. 4 shot. The killing occurred on the northeast corner of the intersection of Joplin and 7th streets. The Family Beverage No. 3 place of business was on this corner and this place of business was one of the places employing defendant to serve as a merchant police. As we understand, The Family Beverage No. 3 building extended east and west along 7th street, and was some distance north of the curbline. There was a sidewalk 3 or 4 feet in width near and in front of the building, and between this sidewalk and 7th street sidewalk to the south, there was a graveled area 35 or 40 feet in width. On the southwest corner of the intersection of Joplin and 7th street was the Blankenship hamburger stand. Deceased, just prior to the killing, was at this hamburger stand and walked from there to the place he was shot on the northeast corner of the intersection. The evidence was conflicting as to the direction deceased traveled to reach the northeast corner of the intersection. Some of the state's evidence was to the effect that deceased first walked north from the hamburger stand to the north side of 7th street and then east to the northeast corner of the intersection, but defendant's evidence was that deceased walked· diagonally across the intersection from the southwest corner.

On the night of the killing defendant was driving his 1941 Ford coach and had his shotgun in the rear seat. He drove his car to Family Beverage No. 3 and parked in front of the building a few

minutes before 12 o'clock midnight. This place closed around midnight and defendant expected to act as guard for whoever took the money from this place to make a night deposit. Defendant's evidence as to what occurred after he parked his car, in narration, may be stated as follows:

"I parked my car, headed somewhat northwest, in front of Family Beverage No. 3 on the northeast corner of 7th and Joplin about 3 minutes till 12 o'clock, and when I drove up I saw three men standing over near the hamburger stand on the southwest corner of 7th and Joplin, and recognized Tom Morrison (deceased) as one of the three. I had seen him twice before on that night, the first time at Miller Motor Company where he said to me, 'You son of a bitch, I will kill you.' I got in my car and left that place. Later in the evening I saw him at Three Winners, and he started towards my car and I got in my car and left. After I parked my car in front of Family Beverage No. 3, I went inside Family Beverage No. 3 and asked Jones (an employee therein) if he was ready to go to the bank; talked to Jones a few minutes. Then I turned around and walked out; went back to my car. When I got back to my car I saw Tom Morrison coming cata-corner across the street from the hamburger stand; he came northeast across the intersection. I tried to get around to my steering wheel where I could get in the car. As Morrison came across the street he said, 'You son of a bitch, I will kill you.' At that time he was pretty near across the street. He had his hand right there (indicating the right side). I knew his reputation for being a good shot and being able to pull his pistol quick from his holster. He had his hand where he carried his gun. I ran around on the north side of my car, on the right hand side; opened the door, reached in, got my shot gun. He kept coming right at me and did not move his right hand from his gun. As he came toward me after making that remark I shot him. I shot him to keep him from killing me; I was afraid of him."

A plat of the scene was used at the trial, but is not here and it is difficult to appreciate distances. But as we understand, deceased had reached the gravel area in front of Family Beverage No. 3, and was 25 or 30 feet from defendant when the shot was fired. Defendant said deceased continued to come on after the shot but fell some 12 or 15 feet south of his car.

Rudolph Canki, an employee of Family Beverage No. 3, testified as a witness for the state that he saw defendant a "good five minutes" before the shooting on the little sidewalk in front of Family Beverage No. 3; that defendant had his shotgun in his hand "pacing up and down in front of the store" (defendant denied that). Canki did not see defendant at the moment the shot was fired, but upon hearing the shot he went out, asked defendant, "What happened? What is wrong?" and that defendant said, "He has been following me around all night long trying to kill me, and I just beat him to it." (De-

fendant said that he said to Canki, "He has been following me around all night, and it was him or me.") Canki said that defendant, when he was in Family Beverage No. 3, just prior to the shooting, said nothing about going to the bank, and Jones did not remember whether defendant came into Family Beverage No. 3 after he drove up and parked, but said the defendant came to take him (Jones) to the bank. Jones said that he did not see deceased prior to the shooting. When the officers came to the scene of the shooting, in a few minutes thereafter, deceased was lying where he fell. His pistol was in the holster on his right side and down inside his trousers.

Dr. Ward, optometrist, testified that he examined the eyes of deceased for glasses in April, 1945, and that senile cataracts were developing in both eyes. Mrs. Morrison, a state witness and widow of deceased, said that deceased had difficulty in recognizing people and that his eyes had grown worse in recent years. But she said he wore glasses only to read. Also, there was evidence that deceased did not have his right hand as if on his pistol as he walked across the intersection. We think the above is a sufficient statement.

The admitted evidence complained of pertains to evidence that deceased was a member of the Masonic lodge and the Methodist church. In the course of the direct examination of Mrs. Morrison she was asked if deceased was a member of a church, and answered, "Well, he always called his lodge his church." Objection was made that such evidence would inject into the case "some prejudice, some favoritism on the part of members of the jury." Special counsel for the state, who was examining Mrs. Morrison, in answer to the objection, said that he made "these offers of membership in civic organizations and other associations of the deceased", because of the opening statement of defendant's counsel that deceased was turbulent and quarrelsome. Then, out of the presence of the jury, the point was argued to the court, and the objection was overruled. Mrs. Morrison then testified that the deceased was a member of the Masonic lodge and the Methodist church. John F. Potts, a state witness, in rebuttal, in answer to an inquiry as to his occupation, said that he was "secretary and registrar of the Scottish Rite Body of Free Masons." And then Potts testified that he had known deceased 30 years and that his reputation "for being a peaceable, law abiding citizen" was good. Julius Becker was called in rebuttal by the state and testified that he had resided in Joplin since 1881; that he was cashier of the Citizens State Bank of Joplin; that he had known deceased for 30 years; that deceased was employed by this bank as watchman and that his reputation "for being a peaceable and law abiding citizen" was good. But defendant made no objection to the evidence of Potts that he was Scottish Rite secretary, etc. And the witness Becker was not asked anything about the Masonic order and gave no evidence on that subject. Defendant, however, asserts in the brief that Becker "was a

known active worker in the Masonic lodge'', and that Potts and Becker were placed on the stand ''solely for the purpose of influencing some members of the jury who were Masons.''

▉ The learned assistant attorney general says the point on the evidence of Mrs. Morrison is not preserved for review. The assignment on admission of evidence in the motion for a new trial and in the brief is: ''That the trial court erred in permitting irrelevant, immaterial and incompetent 'evidence to be introduced before the jury; . . . that said irrelevant, immaterial and incompetent evidence was introduced by members of the Masonic lodge apparently with the intention of assisting the state in a conviction and to influence said jurors in the case; that to do this they introduced one Julius Becker and the secretary of the Scottish Rite Masonic Body of Joplin, one John F. Potts.''

Sec. 4125 R. S. 1939, Mo. R. S. A., Sec. 4125, provides that ''the motion for a new trial shall be in writing and must set forth in detail and with particularity, in separate numbered paragraphs, the specific grounds or causes therefor. . . .'' It will be noted that Mrs. Morrison is not named in the assignment, but complaint is made of the evidence as to the Masonic lodge, the very meat of the assignment. Dealing with an assignment on the admission of evidence in State v. Ryan (Mo. Sup.), 50 S. W. (2d) 999, l. c. 1000, the court said: ''It is sufficient if the assignment contains the name of the witness, the substance of the testimony complained of, and the grounds of its admissibility or inadmissibility. This is the better practice.'' The Ryan case, on the point, was referred to in State v. Nienaber, 347 Mo. 615, 148 S. W. (2d) 1024, l. c. 1026, and in the situation there it was said that the ''error, if any, was not preserved for review.'' However, the point was ruled and held there was no error. In the Nienaber case, these cases are cited: State v. ▉ Buckner (Mo. Sup.), 80 S. W. (2d) 167, l. c. 169; State v. McKeever, 339 Mo. 1066, 101 S. W. (2d) 22, l. c. 28.

The situation in the Nienaber case and the Buckner case was not substantially comparable to the present situation. Here the evidence complained of in the assignment pertained to the membership of deceased in the Masonic lodge, and the omission of Mrs. Morrison's name in the assignment did not detract from the subject matter complained of. Mrs. Morrison was the only witness who testified that deceased was a member of the Masonic lodge. The omission of the name in the Ryan case assignment was not held to be fatal, but that to include the name in the assignment was the better practice. The assignment in the Nienaber case did not involve the omission of the name of a witness. In the McKeever case complaint was made of evidence tending to show the commission of other offenses. In ruling the point the court said [101 S. W. (2d) l. c. 28]: ''The assignments bearing on the issue in the motion for new trial fail to specify any

witness testifying to the commission of other crimes by appellant or any specified crime to which the assignment might refer and, in some instances, any ground upon which the alleged error was based." Manifestly the McKeever case ruling is not applicable here. The McKeever case cites the Buckner case and State v. Bagby, 338 Mo. 951, 93 S. W. (2d) 241; State v. Rosegrant, 338 Mo. 1153, 93 S. W. (2d) 961. The omission of the name of a witness was not involved in these cases.

There is no claim that the evidence of Mrs. Morrison was competent; the state rests the point on the contention that the question is not for review. To support such contention these cases are cited: State v. Gentry, 320 Mo. 389, 8 S. W. (2d) 20, 1. c. 27; State v. Zoller (Mo. Sup.), 1 S. W. (2d) 139, 1 .c. 141; State v. Taylor, 323 Mo. 15, 18 S. W. (2d) 474, 1. c. 477. Neither of these cases involve the omission of the name of a witness in an assignment.

The purpose of a motion for a new trial is to call to the attention of the trial court and the appellate court on appeal the errors alleged to have been committed against the defendant during the trial. State v. Hill et al. (Mo. Sup.), 76 S. W. (2d) 1092; State v. Burns, 312 Mo. 673, 280 S. W. 1026, 44 A. L. R. 848. The trial court, at the time defendant's motion for a new trial was taken up and overruled, made separate pronouncement as to each ground in the motion, and made reference to the evidence of Mrs. Morrison pertaining to the lodge and the church. So it appears that the assignment did call to the attention of the trial court the evidence complained of, although Mrs. Morrison's name was omitted from the assignment. We rule that the assignment is sufficient to preserve for review the admission of the evidence of Mrs. Morrison that deceased was a member of the Masonic lodge.

Does the admission of such evidence constitute reversible error? The only purpose such evidence could have served was to bolster the good reputation evidence as to the deceased on the one hand, and on the other hand, prejudice the jury against defendant. The trial court, in the pronouncements at the hearing on the motion for a new trial, said that if the evidence as to the Masonic order had been "deliberately and persistently and continuously injected into the case there might be cause for complaint," but was of the opinion that such was not the case. The record, however, shows that the prosecution was quite persistent to get evidence to the jury that the deceased was a Mason. After defendant's objection to this evidence was overruled, and proceedings were resumed in the presence of the jury, Mrs. Morrison was asked, "You might tell the jury if your husband belonged to the church", and answered, "Well, he did belong to the Methodist church, but in the late years, why, he wasn't able to go and he had to work at nights, and just wasn't able to, and we just didn't attend." Then she was asked, "What other organi-

zations did your husband belong to?" Objection was made and over-ruled, and Mrs. Morrison, evidently not appreciating just what counsel was driving at, answered, "No, he didn't belong to anything else." Then she was asked, "Did he belong to ——?" The question was interrupted by an objection which was overruled. Then she was asked, "What organizations or orders, if any, did your hus-band belong to?" and answered, "He didn't belong to any other than what I said." Then she was asked, "What did you say?" and then apparently it dawned on Mrs. Morrison as to what was wanted and she answered, "Well, he belonged to the Masonic lodge, he belonged to the Methodist church, only he just didn't attend." It can hardly be said that this evidence was not deliberately injected into the case.

We have not found any case dealing with a situation such as here, but somewhat analogous, in a homicide case, on the point of getting evidence before the jury which would tend to create sympathy and favor for the prosecution on the one hand and prejudice against the defendant on the other, is State v. Johnson, 349 Mo. 910, 163 S. W. (2d) 780. In that case the widow of the deceased was permitted to testify as to the family and children of the deceased, but it was held that the point was not preserved for review. However, it was stated that such evidence was immaterial and should not be admitted. In State v. Baublits, 324 Mo. 1199, 27 S. W. (2d) 16, the widow of deceased was permitted to testify as to the number and ages of their children. The court said [27 S. W. (2d) l. c. 19]: "As it is necessary to reverse the judgment and remand the cause on another ground, we need not hold that the evidence constituted prejudicial error; but we do hold that the evidence was irrelevant to any issue in the case and should not have been admitted."

Defendant's plea of self-defense depended on his own evidence and the evidence of others as to threats made against him by deceased, and he was entitled to go to the jury without evidence before the jury that deceased was a Mason and a member of the Methodist church, or of any church. In other words defendant was entitled to a fair and impartial trial, and we are not convinced that he had such trial. We rule that the admission of the evidence that deceased was a member of the Masonic order, when added to the conceded obscurity of instruction No. 6, infra, is sufficient to constitute reversible error. The evidence that deceased was a member of the Methodist church is not preserved for review in the assignment, but in view of a second trial we should say that such evidence was incompetent and should not have been admitted.

 Defendant assigns error on the refusal to permit the prosecuting attorney and a deputy sheriff to testify that defendant had gone to them for protection from deceased and complained to them that deceased had threatened his life. Such evidence was properly excluded,

because it was self serving. State v. Golden, 330 Mo. 784, 51 S. W. (2d) 91, l. c. 94; State v. Atchley, 186 Mo. 174, l. c. 194, 84 S. W. 984; State v. Lovelace (Mo. Sup.), 39 S. W. (2d) 533; State v. Maguire, 113 Mo. 670, l. c. 673, 21 S. W. 212. See also 1 Wharton's Criminal Evidence (11th Ed.), Sec. 505, p. 791; 20 Am. Jur., Sec. 559, p. 472.

■ Defendant also complains on the refusal to permit evidence of a specific act of deceased, an encounter with one Ceaf Hames, offered to show that deceased was of a turbulent and violent disposition. Evidence that deceased bore the reputation of being of a turbulent or violent disposition was competent, and defendant had such evidence, but such reputation cannot be proved by specific acts of violence. State v. Naylor, 328 Mo. 335, 40 S. W. (2d) 1079, l. c. 1084, and cases there cited.

■ The complaint made on instruction No. 2 is that neither it nor any other instruction defined reasonable doubt. We overrule this assignment. State v. Robinson, 117 Mo. 649, l. c. 661, 23 S. W. 1066; State v. Ransom et al., 340 Mo. 165, 100 S. W. (2d) 294, l. c. 299.

■ Instruction No. 4 was on murder in the second degree. The point made is that the instruction does not define self-defense and does not stand alone, "but depends upon other instructions, which apparently were meant to be given but which were not given." We have carefully examined this assignment, but find it without merit.

■ The complaints on instruction 6 are: (1) That it fails to tell the jury that communicated and uncommunicated threats might be considered in explaining the conduct and apprehension of defendant at the time of the shooting; and (2) that the instruction ■ is vague and uncertain as to what weight might be given to evidence of threats. The instruction does not specifically tell the jury to take into consideration evidence of uncommunicated threats, but that omission will be corrected at another trial. The State concedes that the instruction "is not as clear as it might be", and points out why it is not. Any lack of clarity will be corrected at another trial. We made reference, supra, to instruction No. 6, in considering the assignment on the admission of evidence. Instruction No. 7 was on the reputation of defendant "for being a law abiding citizen" and is in the usual form, and in effect, the same as the instruction approved in State v. Maupin, 196 Mo. 164, l. c. 174, 93 S. W. 379.

■ While on the subject of character and reputation we might, in view of another trial, say something on that subject. It appears in the record that defendant called John Rickman, who had known defendant for 50 years, as a reputation witness. Rickman was asked if he knew defendant's "general reputation for being a peaceable, law abiding citizen", and was told to answer yes or no, and his answer was, "Well, I would say yes." He was then asked, "Is that reputation good or bad?" and answered, "good." On cross examination the fol-

612

lowing occurred: "Q. And the testimony that you have just given was on your own opinion and no one else, is that right? A. Well, it is just what I know of Mr. Cavener. Q. Yes, sir, just what you know yourself? A. Yes. Q. And you never discussed his reputation with anyone, did you? A. I have no recollection of discussing his reputation, no." Thereupon counsel for the state asked that the evidence of the witness as to defendant's reputation be stricken and the "jury admonished to ignore it." Then counsel for defendant asked, "Q. Mr. Rickman, reputation is what people say about a person in the community in which he lives. Have you ever heard anybody say that he didn't have a good reputation for being a peaceable, law abiding citizen?" and answered, "I never did." Objection was made, "That isn't the way to prove reputation, that you never heard anything." The objection was sustained and exception taken, but no assignment on this was made in the motion for a new trial. And a cautionary instruction was given directing the jury to "disregard all questions by counsel to witnesses to which the court has sustained objections and all testimony of witnesses objected to and to which the court has sustained objections and also all testimony which the court has ordered stricken out of the record."

"It is well settled that the testimony of a witness to the effect that he has never heard anything against the character or reputation of a person is admissible to prove the good character of such person, provided the witness is shown to have been in such position that he would have heard anything that was said concerning the person's character or reputation. Negative evidence is viewed as the most cogent evidence of a person's good character and reputation, because in the absence of any discussion about character, it may reasonably be presumed that the person's reputation is good." 20 Am. Jur., Sec. 328. p. 308; 1 Wharton's Criminal Evidence (11th Ed.), Sec. 334, p. 465. And to the same effect are the rulings in State v. Grate, 68 Mo. 22; State v. Brandenburg, 118 Mo. 181, 23 S. W. 1080; State v. Pool, 314 Mo. 673, 285 S. W. 726; State v. Harrison (Mo. Sup.), 24 S. W. (2d) 985. One ruling in the Grate case was overruled in Roe v. Bank of Versailles, 167 Mo. 406, l. c. 421, 67 S. W. 303, but not on the point of reputation evidence.

The sufficiency of the assignment that the evidence does not justify the verdict, and that the punishment assessed shows bias and prejudice of the jury against defendant is challenged. Defendant does not claim that a submissible case was not made. As we understand, defendant means by this assignment that the evidence does not justify the punishment fixed, and that such indicates prejudice on the part of the jury. Since there will be another trial it will not be necessary to say more of this assignment.

The judgment should be reversed and the cause remanded. It is so ordered. ▆ *Dalton, C.,* dissents; *Van Osdol, C.,* concurs.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur except *Conkling, J.,* who concurs in result only.