STATE of Missouri, Respondent,

v.

Virginia A. TWENTER, Appellant.

Virginia A. TWENTER, Respondent,

v.

STATE of Missouri, Appellant.

No. 71319.

Supreme Court of Missouri,
En Banc.

Oct. 16, 1991.

As Modified on Denial of Rehearing
Nov. 19, 1991.

Nancy A. McKerrow, Columbia, for appellant.

William L. Webster, Atty. Gen., Andrea K. Spillars, Asst. Atty. Gen., Jefferson City, for respondent.

HOLSTEIN, Judge.

Defendant Virginia A. Twenter was convicted of the first degree murders of her father, J.D. Wells (Count I), and her stepmother, Marilyn K. Wells (Count II) pursuant to § 565.020.[1] The jury assessed punishment at life imprisonment without possibility of parole for fifty years on Count I. The death penalty was assessed on Count II. Defendant appeals from the judgment imposing those sentences. Defendant also filed a petition for post-conviction relief pursuant to Rule 29.15. The court hearing the post-conviction proceeding (motion court) found that defendant had been denied effective assistance of counsel. The motion court set aside the convictions and ordered a new trial on all issues. The state appeals from the motion court's judgment

---

1. All references to statutes are to RSMo 1986.

setting aside the convictions. This Court has jurisdiction of the appeal. *Mo. Const. art. V, § 3.* The judgments are affirmed in part, reversed in part and remanded for a new trial on the issue of punishment on Count II.

Defendant challenges the sufficiency of the evidence to establish her criminal agency in the murders. In determining the sufficiency of the evidence, all evidence together with all reasonable inferences is viewed favorably to the verdict, and evidence or inferences contrary to the verdict are ignored. *State v. White,* 798 S.W.2d 694, 697 (Mo. banc 1990).

### FACTS

The body of J.D. Wells was found by his daughter, Anna Laas, in the living room of the Wells' home at about 7:15 a.m. on May 5, 1988. About noon the same day the body of Marilyn Wells was found in a field approximately eight miles from the Wells' home. Her body was approximately fifty-six feet from a gravel road. Both deaths were caused by gunshot wounds. J.D. Wells had been shot in the back and in the chest. Marilyn had been shot once in the chest. She appeared to have been shot at the site where her body was discovered.

On the evening of May 4, 1988, between 9:30 and 11:30 p.m., a neighbor of the Wells was watching television when she heard two gunshots coming from the Wells residence.

Ballistic evidence indicated that the fatal shots were fired by a .38 caliber pistol registered to Hugo Twenter, appellant's ex-husband. Hugo had discovered the gun missing from his pickup truck as he was leaving Virginia Twenter's residence one evening in April of 1988. He had reported the missing gun to law enforcement officers prior to the murders. There was also evidence that defendant knew where Hugo kept the gun in the pickup truck. After the gun was taken, defendant indicated to Hugo that she could produce the gun. The gun was found on May 6, 1988, in a creek south of the Sedalia city limits, not many miles from the scene of the crime.

Two bloody shoe prints were found on the linoleum floor at the Wells residence. The prints were the same design, size, shape and pattern as were the shoes worn by defendant when she was interviewed by police. However, an expert witness for the state could not say with certainty that defendant's shoes made the print on the linoleum. A part of a thorn taken from the sole of one of the shoes was similar to locust tree thorns found on the ground on a direct line between the road and the place where Marilyn Wells' body was found. A few feet from Marilyn's body was a pack of Marlboro cigarettes, the same brand smoked by defendant.

A search of defendant's home turned up a cash register tape. The tape was hidden under a mattress and mattress liner in defendant's bedroom. The cash register tape had been made by a cash register used at J.D. Wells' restaurant, the "Coffee Pot Cafe." The tape reflected receipts from May 3. J.D. Wells had taken the tape marked "May 3" when he left the restaurant on the afternoon of May 4, 1988.

Defendant was in serious financial trouble at the time of the murders. Many of her debts were in arrears. Six months prior to the murders, J.D. Wells sent a letter to defendant demanding payment of a loan he had made to her the prior year. Her car had been repossessed. The lender on her home mortgage had sent a notice of acceleration of the debt and intent to foreclose. Five days prior to the murders defendant had purchased a new car, paying for it with a $4,400 check. The check had been returned to the car dealership, and on May 4th the dealer had called defendant, insisting that the check be paid. Defendant told the dealer that she was relying on a loan from her father to pay for the car. Yet a stepsister and a brother of defendant testified that defendant and her father had not gotten along well for some time prior to the murders.

On the morning of the same day the Wells' bodies were found, defendant appeared at the car dealership with a check for $4,400 signed by Marilyn Wells on the "Coffee Pot" account. That same morning she presented a check to a bank, also

signed by her stepmother on the same account, for $4,000.

The checkbook and check register on the "Coffee Pot" account were found in the Wells home. It showed all checks accounted for except the last three missing checks, numbered 3743, 3744, and 3745. Two of those checks were the ones that had been presented by defendant. The third check was never located. None of the three checks were recorded in the check register. There was evidence that J.D. Wells was a careful businessman and usually kept records regarding his checks and loans to his children.

The police interrogated defendant. She could only verify her whereabouts before 9:30 p.m. and after 11:30 p.m. on the night of May 4, 1988. She first told police she had driven to Knob Noster during that time frame. However, she testified at trial that she went to Warrensburg and met two men with whom she performed "some sex acts." She could only give the full name of one of the men, Robert Arnell, and the first name of the other, Steve. According to defendant, Arnell "was on a construction site in Warrensburg." She had no other knowledge about where the men lived.

After J.D. Wells' body was discovered but before Marilyn had been found, family members, including defendant, began gathering at the home of defendant's brother, John Wells. Anna Laas, defendant's stepsister, was describing what she had found earlier that morning to others present. When she reached the point in her story mentioning the bloody shoe prints left on the linoleum, defendant said, "Oh God," and fainted. When she regained consciousness, defendant insisted on making a telephone call to her housemate, Mike Turner. Anna and another sister, Clara Denker, overheard defendant's part of the conversation. They each testified that they heard defendant say that both her father and stepmother had been shot. At the time, Marilyn Wells' body had not been discovered. Upon making that statement defendant stopped herself, looked at Laas and said, "Well, just my dad's been shot, and we can't find my mom."

## I. DIRECT APPEAL

### A.

Defendant argues that the state's evidence does not exclude the "reasonable hypothesis of innocence" that her parents loaned her the $8,400 earlier in the evening of May 4, 1988, and that her parents were well when she left them at about 6:30 p.m. Defendant would have this Court discount the evidence of the bloody shoeprint, the cash register tape, the evidence indicating that she had possession of the murder weapon, her reaction upon learning of the shoeprint, and the content of the conversation with Mike Turner. That would require a weighing of the evidence. This Court does not weigh evidence in a jury case. That function belongs to the jury. Here, we view the evidence favorably to the verdict.

The evidence established defendant's monetary motive for the murders, her access to the murder weapon, and her inconsistent and unverifiable explanation of her whereabouts on the fatal evening. The chain of circumstances is completed by 1) the bloody shoeprint at the scene, 2) defendant's reaction upon learning the bloody shoeprint had been found, 3) the cash register tape being found in defendant's bedroom, and 4) the checks in the defendant's possession which had not been recorded in the check register. The facts in this circumstantial evidence case are 1) consistent with each other, 2) consistent with guilt, and 3) inconsistent with any reasonable theory of innocence, including that suggested by defendant. *State v. Wahby*, 775 S.W.2d 147, 154 (Mo. banc 1989). The evidence need not be conclusive of guilt, nor need it demonstrate the impossibility of innocence. *Id.* at 154–55.

Added to the above evidence was the evidence that defendant's father did not have a good relationship with defendant, the evidence that he had recently demanded that she pay the loan, and defendant's premature statement that both parents were dead. This evidence, while not essential, was properly before the jury and also tends to negate defendant's theory of inno-

cence. The evidence, although circumstantial, was sufficient to establish defendant's criminal agency and inconsistent with any reasonable theory of innocence.

## B.

■ Defendant claims that the motion for mistrial should have been granted following the playing of part of an audio tape made of a police interview of Linda Turner. Linda was called as a witness for defendant. She testified that she was with defendant after 11:30 p.m. on May 4, 1988. During cross-examination the prosecutor tried to establish that defendant told Linda she had received a $5,000 check from her father a week prior to the killings. Turner denied she had made such a statement.

During rebuttal, the state called police officer William Chapman, who had conducted an interview of Turner on May 6, 1988. Chapman testified that Turner claimed to have been told by defendant that defendant's father had given her a $5,000 check a week before the murders. Chapman was then asked to play the portion of the tape in which Turner made that statement. Apparently by mistake, the tape began with one of the officers asking, "Why should she—if she did it, why would she kill her own parents?" Turner replied, "Only thing I can think of is the money that she's gotten." Immediately after that followed the statement by Turner that contradicted her trial testimony that she had not been told about the $5,000 given to defendant by J.D. Wells a week prior to the murders. Counsel moved for a mistrial based upon the above-quoted question and answer suggesting defendant's possible motive. No other relief was sought. The trial court, *sua sponte*, ordered the jury to disregard the audio tape.

The trial court and the court reporter did not hear the question and answer and had to listen to the tape recording three times in chambers to understand what was said. The judge questioned whether the jury heard the offending question and answer, and noted that the defendant's motive had been gone into in detail with other witnesses. The judge concluded, "[I]n the event it was in fact heard, it is not prejudicial in this case...."

The trial judge was clearly in a better position to determine if the tape was audible to jurors and, if audible, the tape's prejudicial effect. "A motion for mistrial is addressed to the sound discretion of the trial judge ... the declaration of a mistrial is a drastic remedy to be employed only in the most extraordinary circumstances." *State v. Gilmore*, 681 S.W.2d 934, 943 (Mo. banc 1984) (citations omitted). In this case the statement by the witness that the only reasonable motive was the money defendant obtained was merely a recital of what everyone within earshot of the courtroom had already learned from other evidence. Also, replaying the question and answer appear not to have been intentional on the part of the state. The state did not attempt to take advantage of the statement by reiterating it in argument. Defense counsel sought no other relief than a mistrial. The jury was instructed to disregard the tape. Under the totality of the circumstances, the trial court did not abuse its discretion in determining that the playing of the tape was not prejudicial and denying a motion for mistrial.

## C.

■ Defendant argues that the trial court committed plain error by failing to *sua sponte* grant a mistrial due to a portion of the state's closing argument. During argument the prosecuting attorney reviewed the instructions differentiating first and second degree murder. He stated:

It says: Cool reflection upon the matter, however brief, doesn't mean she made a wise decision or even a reasonable decision; did she think about it before she did it? Did she not act under a fit of passion?

. . . .

When you look at it you will see the only difference in the first degree murder and murder in the second degree is the element of deliberation. The only way you could say she was guilty of murder in the second degree is if you thought she didn't think about it at all, that it was committed under the—within the heat of passion.

Defendant cites no case holding that the argument made in this case is error. Defendant's contention is based entirely on § 565.023.1. That section makes the knowing killing of a person "under the influence of sudden passion arising from adequate cause" the crime of voluntary manslaughter, not murder in the second degree.

Although the prosecutor's discussion may have been incomplete, it was not a false or misleading statement of the law. The prosecutor did not misstate what must be present to find defendant guilty of first degree murder, i.e., deliberation or "cool reflection for any length of time, however brief." § 565.002(3). Any finding that the defendant was acting out of passion will defeat a conviction of first degree murder. But second degree murder is not excused merely because the accused acted in a state of rage or anger; the passion must be sudden and based upon adequate cause. § 565.023.1(1). Thus the prosecutor did not misstate the law during closing argument. The trial court has wide discretion in controlling arguments. State v. Mahurin, 799 S.W.2d 840, 844 (Mo. banc 1990). There was no abuse of discretion and no error, plain or otherwise, in refusing to declare a mistrial based on the state's closing argument.

### D.

The trial court gave MAI–CR3d 302.04, the jury instruction defining "proof beyond a reasonable doubt." Defendant attacks the instruction claiming it dilutes the state's burden of proof. The definition contained in the instruction has been upheld repeatedly. State v. Griffin, 818 S.W.2d 278, 282–283 (Mo. banc 1991); State v. Murray, 744 S.W.2d 762, 771 (Mo. banc 1988), cert. denied 488 U.S. 871, 109 S.Ct. 181, 102 L.Ed.2d 150 (1988); State v. Antwine, 743 S.W.2d 51, 62–63 (Mo. banc 1987), cert. denied 486 U.S. 1017, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988); State v. Bowman, 741 S.W.2d 10, 15 (Mo. banc 1987), cert. denied 488 U.S. 829, 109 S.Ct. 83, 102 L.Ed.2d 60 (1988); State v. Sandles, 740 S.W.2d 169, 175 (Mo. banc 1987), cert. denied 485 U.S. 993, 108 S.Ct. 1303, 99 L.Ed.2d 513 (1988); State v. Guinan, 732 S.W.2d 174, 178 (Mo. banc 1987), cert. denied 484 U.S. 933, 108 S.Ct. 308, 98 L.Ed.2d 266 (1987). These cases of recent origin firmly establish that the instruction complained of does not violate constitutional standards by decreasing the state's burden of proof. No purpose would be served by an extended discussion. The point is denied.

### E.

■ Defendant testified in her own behalf at trial. On rebuttal the state called defendant's brothers, John Wells and Robert Wells. They each testified that the defendant's reputation for truthfulness was not good. Defendant claims that because John Wells admitted to not having "very good knowledge of her friends the last two years," John Wells was not in a position to know his sister's reputation. She also argues that due to Robert Wells' being in the Navy for the six years preceding trial, he also had insufficient current knowledge of defendant's reputation to express any view on the subject.

Defendant omits testimony from both brothers that they grew up in the same home as defendant and had known her all her life. It is not critical that both witnesses be acquainted with defendant's social companions or that they saw her on a regular basis immediately prior to the crime or prior to the trial. Little doubt exists that the two brothers were in a position to know defendant's reputation for veracity among family members and other acquaintances at the time of trial and at all relevant times prior to the trial.

■ When defendant took the stand, she placed her reputation for truthfulness and veracity in issue, and the state was permitted to present evidence that defendant did not have a good general reputation for truth and veracity. State v. Trimble, 638 S.W.2d 726, 735 (Mo. banc 1982). It is only necessary that the witness be in a position to have heard anything that was said concerning defendant's reputation. State v. Cavener, 356 Mo. 602, 202 S.W.2d 869, 875 (1947). There was no error in admitting the evidence of defendant's reputation for veracity.

## II. RULE 29.15 APPEAL

The state appeals the setting aside of the convictions by the motion court under Rule 29.15. The basis of the motion court's decision to set aside the conviction and sentence was a series of claims of ineffective assistance of counsel in both the guilt and punishment phase.

■ The standard of review applicable in a Rule 29.15 proceeding is that the motion court's judgment will be affirmed unless clearly erroneous. *Rule 29.15(j)*. Deference is given to the motion court's superior opportunity to judge the credibility of the witnesses. *State v. Feltrop*, 803 S.W.2d 1, 12 (Mo. banc 1991). That does not relieve the movant of the burden of proving his grounds by preponderance of the evidence. *Rule 29.15(h)*. Not only must a movant prove his allegations by preponderance of the evidence, but a "heavier burden" arises from a "strong presumption" that counsel performed in a reasonable manner. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674; *Sanders v. State*, 738 S.W.2d 856, 858 (Mo. banc 1987).

■ In order to sustain the trial court's grant of relief grounded upon the claim of ineffective assistance of counsel, there must be evidence in the record showing 1) that defendant's attorney failed to exercise the customary skill and diligence that a reasonably competent attorney would perform under similar circumstances, and 2) that she was thereby prejudiced. *Strickland v. Washington*, 104 S.Ct. at 2064. The performance component requires counsel to exercise the "skill and diligence that a *reasonably* competent attorney would exercise under similar circumstances." *State v. Sanders*, 738 S.W.2d 856, 858 (Mo. banc 1987), quoting *Thomas v. Lockhart*, 738 F.2d 304, 307 (8th Cir.1984) (emphasis in original). The Supreme Court of the United States has intentionally avoided establishing more specific guidelines than the objective standard of "reasonableness" under prevailing professional norms. *Strickland*, 104 S.Ct. at 2064–65. However, the caselaw of this state, particularly cases decided by the appellate courts, have identified specific situations in which counsel's performance has been deemed to meet the prescribed standards. Strategic choices made after thorough investigation of the law and facts are virtually unchallengeable, and strategic choices made after less than complete investigation are reasonable to the extent that reasonable professional judgments support limitations on investigations. *Strickland*, 104 S.Ct. at 2066. In the real world containing real limitations of time and human resources, criminal defense counsel is given a heavy measure of deference in deciding what witnesses and evidence are worthy of pursuit. *Id.*

■ The prejudice component requires the defendant to demonstrate that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 104 S.Ct. at 2068. Counsel's conduct must be viewed in the context of the entire record. If counsel is not shown to have failed to discover or present evidence or legal issues that would be material and admissible to establish reasonable doubt as to defendant's guilt, no prejudice is shown. Every miscue by counsel is not prejudicial.

### A.

The motion court found that defense counsel was ineffective in failing to obtain expert testimony to show there were "a number of tennis shoe models ... which could have made the print in question." At trial the state called forensic chemist John Cayton. He testified that the "class characteristics, [which] is the design, and the size, the shape of the sole pattern, and the wear were similar between the [imprint of the tennis shoe seized from defendant] and the prints on the linoleum." On cross-examination, Cayton admitted that he was unable to determine any specific characteristic common to the footprint and the shoe and he was unable to say that the footprint was made by defendant's shoe. He further admitted to the possibility that the same shoe pattern may show up on different brands and sizes of shoe.

At the post-conviction hearing no expert evidence on shoe design was presented. The only reference to such evidence occurred prior to the hearing when defen-

dant's post-conviction counsel made an "offer of proof" in support of an untimely filed amended post-conviction motion. That offer was merely a statement by counsel of what he expected to prove if permitted to amend. The amendment was not permitted. The offer was never renewed after the hearing commenced, and no expert witness was called.

■ To support a charge of ineffective assistance of counsel based on failure to secure the testimony of an expert witness, at a minimum movant is required to show what the evidence would have been. *Holt v. State*, 735 S.W.2d 191, 194 (Mo.App. 1987); *Taylor v. State*, 728 S.W.2d 305, 307 (Mo.App.1987). This record is bereft of any evidence on the subject.

■ Even accepting the "offer of proof" by counsel as evidence, there was nothing that would exonerate defendant, and the evidence, as recited by counsel, was merely cumulative. Post-conviction counsel for movant asserted that the manager of the Payless Shoe Store in Sedalia would testify "as to the frequency and distribution of shoe soles seized from defendant," and that those soles were common to all shoes of that particular model and brand, as well as other shoes and models. Nothing in the "offer of proof" disclosed any further details regarding the "frequency and distribution" mentioned by counsel. Post-conviction counsel also asserted in his "offer of proof" that he intended to call Dr. Robert Briner of the SEMO crime laboratory in Cape Girardeau, who would testify that the footprints were not conclusively shown to be made by defendant's shoes. None of this evidence, had it been presented, proved anything that was not already before the jury by way of John Cayton's testimony. Failing to present cumulative evidence is not ineffective assistance of counsel. *Flowers v. State*, 776 S.W.2d 444, 448 (Mo.App.1989); *Robinson v. State*, 760 S.W.2d 516, 517 (Mo.App.1988).

■ Before leaving this point, the Court notes that the motion court did not solely find defense counsel was ineffective. In addition, the motion court found that the director of the Missouri Public Defender system behaved improperly by choosing not to provide funds for the expert witness. The failure of the state to provide funds is an issue that could have been raised on direct appeal. It was not. Rule 29.15 is not a substitute for direct appeal, and matters that properly should have been raised by direct appeal may not be litigated in a post-conviction proceeding. *Amrine v. State*, 785 S.W.2d 531, 536 (Mo. banc 1990).

The defendant relies on *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), as authority for the proposition that matters external to counsel's actions may support a claim of ineffective assistance of counsel. In *Cronic* the defendant's lawyer was given only twenty-five days to prepare for trial. The portion of the opinion relied on by defendant is found in a footnote:

> The fact that the accused can attribute a deficiency in his representation to a source external to trial counsel does not make it any more or less likely that he received the type of trial envisioned by the Sixth Amendment, nor does it justify a reversal of his conviction absent an actual effect on the trial process or the likelihood of such an effect.

*Cronic*, 466 U.S. at 662, n. 31, 104 S.Ct. at 2048, n. 31. Here defendant has failed to present *any* evidence showing what an expert would have testified to that was not already before the jury. Without such evidence it is pure speculation that the expert testimony would have had an "effect on the trial process." *Cronic* provides no support for the motion court's conclusion.

### B.

The motion court found trial counsel to be ineffective in failing to interview and secure the testimony of Robert Fox, a neighbor of the victims. According to defendant, Fox's testimony would have supported a theory that the victims were murdered by an unidentified man.

Fox told investigators that on the night of the murders, he saw an unidentified man with a long barreled gun crouching in the shadows behind a car parked in the Wells' driveway. These reports were made avail-

able to defense counsel prior to trial. Defense counsel attempted to subpoena Fox for the trial. There was no evidence showing whether the subpoena was ever served on Fox or, if service was not obtained, whether counsel had any information regarding Fox's whereabouts at the time of trial. In addition, during the months leading up to trial, during trial, and for some time after trial, there was a warrant outstanding for Fox's arrest on unrelated charges, the warrant having been issued by the Pettis County Circuit Court. That warrant was never executed.

Fox was deposed in anticipation of the Rule 29.15 hearing. At his deposition he contradicted what he had told investigating officers. Instead of the unidentified man crouching behind a car in the driveway, Fox testified that the man was standing in the open. Instead of being in shadows, Fox testified the man was standing underneath a "pole light" at the rear of the Wells' house. Fox also said he saw defendant's car parked at the Wells' house on May 4, 1988, sometime after 9:30 p.m.

Fox testified at the post-conviction hearing. Again his story changed. At the hearing, he testified he saw the unidentified man the *night before* the murders. He claimed his earlier statements that he saw the man on the night of the murders was mistaken. Fox could not describe the color of the man's trousers because, as Fox put it, "I didn't look that good." At his deposition Fox said the man was wearing blue jeans. In addition, Fox stated that at the time he gave his statement to the police, he "wasn't that sure of it." There were other contradictions in Fox's testimony given during the deposition and at the hearing. But those additional contradictions are unnecessary to highlight the absence of probative value of his testimony.

 Viewing Fox's contradictory and confusing testimony objectively, it would be a reasonable trial strategy not to pursue him as a witness. However, defense counsel did pursue Fox. If service of the subpoena was not made, that was not shown to be the fault of defense counsel. If service was obtained, there was no showing of what counsel could have done to produce Fox. The defendant, who carries the burden of proof, has failed to show that counsel was responsible for Fox's failure to appear and testify. Defendant has failed to prove that Fox would have testified in any way that would have provided a viable defense. Therefore, the facts regarding the failure to investigate Fox are insufficient to support a finding of ineffective assistance of counsel. *Hogshooter v. State*, 681 S.W.2d 20, 21 (Mo.App.1984).

### C.

The motion court also found counsel ineffective for failing to investigate and present evidence that J.D. Wells was involved in a stolen goods ring. The source of this evidence was Norma Wheeler and Elizabeth Lawson, sisters of defendant. They told an investigating officer prior to trial that they believed a man they did not know killed J.D. Wells because Wells was dealing in stolen goods. The state's investigators followed up on this theory and found no usable leads. Both Wheeler and Lawson were questioned about their knowledge on the subject at the post-conviction hearing. Both testified that their father "mentioned something about it" on one occasion, but they had no other information. Prior to trial defense counsel discussed the alleged stolen goods ring with defendant and her former husband, but was unable to uncover any information of benefit. Therefore, counsel did not pursue the issue further.

 The motion court faults counsel for failing to present the Lawson and Wheeler testimony about what they were told by J.D. Wells, assuming the evidence was admissible hearsay under the penal interest exception. In *State v. Turner*, 623 S.W.2d 4 (Mo. banc 1981), a defendant attempted to introduce evidence of an out-of-court declaration of another person. The other person allegedly admitted to committing the crime of which defendant was accused. This Court stated that the general rule in criminal proceedings is that declarations against penal interests are not admissible as an exception to the hearsay rule. *Id.* at 9. The Court noted that if the hearsay has substantial indicia of reliability, such as

corroboration by other evidence, a sworn confession, or statements of eye witnesses to the crime, and if such evidence would exonerate the defendant, it might be admitted notwithstanding this rule. *Id.* at 10. Here there was not a scintilla of evidence to corroborate the extrajudicial statements that Wells dealt in stolen goods. In addition, the fact that the deceased may have dealt in stolen goods is not evidence showing defendant was not guilty. At most, such evidence was a "red herring," requiring the stacking of inference upon inference to be of benefit to defendant. Counsel will not be held ineffective for failing to present inadmissible evidence. *Amrine v. State,* 785 S.W.2d at 534.

### D.

The motion court found that defense counsel was ineffective in failing to interview and call the defendant's sisters, Norma Wheeler and Elizabeth Lawson, to establish defendant's good relationship with her parents. The record does not support a conclusion that defendant and her parents enjoyed a good relationship.

Norma Wheeler testified that before the murders her parents had quit speaking to defendant. The source of the conflict was an unpaid debt of $3,000. From the evidence at the trial and the post-conviction hearing, the $3,000 debt remained unpaid at the time of the victims' death. The closest Wheeler came to saying that there was a good relationship was a statement by Wheeler that her mother had begun visiting with defendant and her mother was "going to try to patch things up" between defendant and her father, but the two "had a lot—all of this anger behind them."

Elizabeth Lawson testified at the post-conviction proceeding that she was close to her parents. However, she gave no testimony at all regarding the relationship between defendant and her parents. The motion court's finding that counsel was ineffective in failing to present evidence of a good relationship between defendant and her parents is unsupported by this record.

In connection with the above finding, the motion court adopted as its finding an allegation that counsel was ineffective in failing to investigate and present evidence that defendant's brother, John Wells, and her sister, Clara Denker, had a bad relationship with the victims. The motion court judge, though he did not say so, apparently believed this indicated that those two had a motive to kill their parents. Neither Lawson nor Wheeler testified that John Wells or Clara Denker had a bad relationship with the victims. That finding is also clearly erroneous.

### E.

The motion court found defense counsel ineffective for failing to thoroughly investigate and interview Mike Turner, defendant's housemate, and failing to call Turner to testify regarding what defendant said in the telephone conversation testified to by Anna Laas and Clara Denker. In addition, the motion court found counsel ineffective in failing to call Turner to testify that defendant was home "sometime around" 11:00 p.m. on the night of the murders. These findings are also unsupported by the record.

Defense counsel interviewed Turner by telephone. In the interview Turner "indicated that he could not remember any of the [telephone] conversation [with defendant] at all." He also testified that Turner had told him in the interview that on the night of the murders, defendant left the home sometime after 7:00 p.m. and was not at home when he went to bed sometime after 11:00 p.m. Turner told defense counsel that defendant said she had returned at 1:30 or 2:30 a.m. Defense counsel testified that he found Turner to be evasive.

Turner, testifying at the post-conviction hearing, remembered being interviewed by persons investigating the murders but could not remember who did the interview or what he said. As he put it, "I talked to so many of them, they had so many questions to ask, I'm really not sure." Turner's recollection of what he told investigators was hazy. Indeed, he had no recollection at all of talking to defense counsel. He also stated that he had a better recollection of events at the time of the post-conviction hearing than he had a short time after the murders. There is nothing to suggest that

a face-to-face encounter would have improved Turner's memory.

■ Mike Turner's post-conviction testimony with regard to his telephone conversation with defendant after the murders was also confusing. On direct examination, when asked if defendant told him during the telephone call that both parents were killed, he replied, "No." When asked about the conversation on cross-examination, Turner replied, "Well, I don't remember exactly what was said, but I know some things that were said." Judged by an objective standard of reasonableness, counsel was well within the mark in deciding not to pursue Turner further.

Even accepting that Turner had an improved recollection of the events as disclosed in his post-conviction testimony, he could not account for defendant's whereabouts during the critical time period between 9:30 p.m. until about 11:15 or 11:30 p.m. on the night of the murders. Thus defendant has also failed to demonstrate prejudice. The motion court clearly erred in finding ineffective assistance of counsel on this claim.

### F.

Counsel was deemed ineffective for failing to locate and interview Robert Arnell and "Steve" (last name unknown). At trial defendant claimed to have been with the two in Warrensburg sometime between 9:30 and 11:30 p.m. The motion court found that because of the delay by the original public defender in locating these witnesses, the witnesses had left the area and could no longer be located. Immediately after that finding the motion court found defense counsel should have learned of these individuals "following discovery." These inconsistent findings are unsupported by the record.

The original public defender sent a paralegal student he had hired for the summer to interview defendant at the jail following defendant's arrest in May of 1988. The only potential alibi witnesses disclosed were Mike Turner and Linda Turner.[2] The information provided by defendant made no mention of Robert Arnell or Steve.

Sometime after her arrest, defendant sent some written materials to the prosecuting attorney in which she set forth her claims of alibi. Neither Robert Arnell nor Steve were mentioned in these materials.

Late in the summer of 1988 a letter was written by defendant, which was brought to the prosecuting attorney. For the first time, the name of Robert Arnell and Steve were mentioned. The prosecuting attorney contacted the Johnson County sheriff and a Warrensburg police detective in an effort to locate Arnell. The efforts to locate Arnell by law enforcement authorities proved fruitless.

The first time the defendant mentioned the names of Robert Arnell or Steve to her own attorney was in a conversation with her second appointed defense attorney about four and one-half months after the murders. Defense counsel was told that Arnell lived in Warrensburg or possibly outside Kansas City. An investigator for the public defender checked every Robert Arnell with a Missouri driver's license. One was a white male who lived outside Kansas City. Defense counsel showed defendant that individual's photograph along with two other photographs of white males. Defendant was asked to point out the correct one. Defendant selected a photograph of a neighbor of an investigator for the defense counsel from Jefferson City. Defense counsel did not pursue the issue further at that time. Two or three days prior to trial, in December of 1988, a friend of defendant's called and disclosed to defense counsel that Arnell had worked on a construction site but had gone to Ohio. Defense counsel was given no other leads.

■ From the above review of the record, there is no evidence that the original lawyer was ever given the names of Robert Arnell or Steve. Defense counsel necessarily relies on his client to identify witnesses and is not required to be clairvoyant. *Johnson v. State*, 479 S.W.2d 416, 420 (Mo.1972). In addition, the supposed alibi witnesses were not produced at the post-conviction hearing. To establish a claim of ineffective assistance of counsel

---

**2.** The two Turners are not related.

for failing to locate and interview witnesses, the defendant must show not only that the witnesses could have been located through reasonable investigation, but it must also be shown that the witnesses would testify if called, and that the testimony would have provided a viable defense. *Hogshooter v. State,* 681 S.W.2d at 21. The total absence of evidence that these witnesses were available at the time of trial and the absence of evidence that their testimony would establish a viable defense defeats any claim of ineffective assistance of counsel based on a failure to investigate and present these witnesses.

### G.

The motion court found counsel to be ineffective for failing to interview and call Norma Wheeler and Elizabeth Lawson to impeach Clara Denker's testimony. Wheeler and Lawson claim to have overheard Denker deny she heard the defendant's telephone conversation. The inconsistent statement that Lawson and Wheeler claimed was made by Denker occurred sometime after the telephone conversation and at a different location. There is no evidence in this record that counsel was told by any source that Norma Wheeler or Elizabeth Lawson had information that might impeach Clara Denker's testimony.

■ Criminal defense lawyers have no duty to interview every person who may possibly have overheard a contradictory statement of a state's witness made at some later date or at some different place. To meet the standard established by the motion court on this point would require defense counsel to have some method of identifying every person in whose presence a state's witness may have uttered some comment about the case, and interview each such person to see if the state's witness had made some statement inconsistent with anticipated trial testimony. The alternative is for defense counsel to be psychic. Both alternatives are unreasonable.

Counsel was never shown to have had any reason to interview Lawson or Wheeler *regarding* Denker's testimony. In short, there is no evidence to establish that a reasonable investigation would have disclosed Denker's alleged prior inconsistent statement.

■ In addition, the law regarding counsel's duty to investigate matters of "mere impeachment" is quite clear. To establish a claim for ineffective assistance of counsel for failure to contact a witness, a prisoner must prove, among other things, that the witness would have been located through a reasonable investigation and that the witness's testimony would have provided a viable defense. *Endicott v. State,* 792 S.W.2d 703, 706 (Mo.App.1990); *Thompson v. State,* 779 S.W.2d 666, 667 (Mo.App.1989); *Hayes v. State,* 774 S.W.2d 886, 888 (Mo.App.1989). If a prior inconsistent statement by a state's witness does not give rise to a reasonable doubt as to defendant's guilt, such impeachment evidence is not the basis for a claim of ineffective assistance of counsel. *Lane v. State,* 778 S.W.2d 769, 771 (Mo.App.1989); *Tate v. State,* 675 S.W.2d 89, 91 (Mo.App.1984). Defense counsel may rely on his client to identify the witnesses to be interviewed. *Johnson v. State,* 479 S.W.2d at 420. Unless there is some showing that counsel learned of the alleged evidence of an inconsistent statement, before or during trial, ineffectiveness of counsel for failing to investigate or produce that evidence has not been established.

The cases relied on by the defendant are demonstrative of circumstances in which a duty to impeach may exist. In *Bonner v. State,* 765 S.W.2d 286 (Mo.App.1988), the court of appeals held that an attorney who knew before trial that a state's witness had prior criminal convictions was ineffective for failing to obtain evidence of those convictions for use in the event the witness denied the prior convictions. In *Trimble v. State,* 693 S.W.2d 267 (Mo.App.1985), a lawyer's failure to inquire further when he was informed *during trial* that the victim's family was paying money to witnesses was deemed ineffectiveness by counsel. Both cases suggest that the duty to investigate regarding prior inconsistent statements for impeachment purposes arises only when there is something brought to the lawyer's attention before or during the

trial indicating that such impeachment evidence is available. In the absence of showing that counsel had some way of knowing prior to or during the trial of the inconsistent statement, the motion court's finding of ineffective assistance on the point is clearly erroneous.

### H.

██ Defense counsel was convicted of unprofessional representation in failing to investigate and call Kathy Wheeler and Julia Ray, employees of Community Bank of Sedalia. Although the motion court did not say what their testimony would have shown, the findings refer to a paragraph in the defendant's *pro se* post-conviction petition alleging that the third missing check was written to defendant and would have explained why the other two checks were not recorded in the check register. The motion court concluded that Wheeler and Ray's testimony, as well as that of unnamed employees of Malmo Motors, would have established a "viable alternative to rebut the state's contention that financial need was a motive." The problem with this finding is twofold.

First, the contention that Kathy Wheeler, Julia Ray, or employees of Malmo Motors could have supplied testimony providing an alternative to the state's evidence of financial need motive is not alleged in the *pro se* or amended post-conviction motion. The state objected to Wheeler's testimony as being outside the pleadings. Rule 29.15(d) requires that all grounds for setting aside the post-conviction motion be contained in the motion. The effect of Rule 29.15(d) is to bar all claims not raised in a timely filed pleading. *Bockover v. State,* 794 S.W.2d 334, 337 (Mo.App.1990); *Rohwer v. State,* 791 S.W.2d 741, 743–44 (Mo.App.1990); *Kelly v. State,* 784 S.W.2d 270, 273 (Mo. App.1989). The time requirements relating to the amendment of pleadings in post-conviction proceedings are valid and mandatory. *Day v. State,* 770 S.W.2d 692, 693 (Mo. banc 1989).

Second, there is nothing in the testimony of Kathy Wheeler, Julia Ray, or employees of Malmo Motors that would have explained the missing check or negated the state's evidence that defendant had a financial motive to commit the murder. The motion court's finding on this issue is unsupported by the record and therefore clearly erroneous.

### I.

██ The public defender's office engages more experienced contract public defenders in capital cases. The local public defender was aware of this shortly after he became involved as counsel. Partially because of this, the local public defender did not undertake an extensive investigation of the facts. The contract public defender did not actively begin to investigate until about four months after the crime. In a concluding paragraph, the motion court finds fault in the local public defender's failure to undertake an immediate and thorough investigation, the State Public Defender Office's failure to act quickly to appoint contract counsel, and the contract counsel's delay in beginning his investigation. The motion court also criticizes contract counsel for the lack of time devoted to preparation for trial.

The record is silent as to how much actual time was spent in preparation by the local public defender or the contract public defender. In addition, the record is barren of real, exculpatory evidence that was not discovered by reason of the inactivity, delay, or lack of time in preparation for trial. While the findings of fact and conclusions of law are rich with rhetoric, those criticisms are not connected with any facts indicating how defendant was prejudiced.

### J.

The motion court concluded that defense counsel was ineffective in investigating and calling witnesses in the punishment phase of the trial. This conclusion was based on several factual findings, not all of which are supported by the record.

The motion court found that defense counsel did not believe the punishment phase would be reached. That finding is contrary to the testimony of defense counsel, and the trial record refutes the finding. The motion court also found an "abject failure to present a professional and rea-

sonably prepared offering of evidence" during the punishment phase. The record at trial shows counsel called three witnesses: a doctor of psychology who had treated defendant professionally, a minister who had visited defendant in jail, and defendant. Taken as a whole, the evidence presented a picture of a woman reared in a dysfunctional, unloving home, that she was emotionally impaired and unable to exercise good judgment after her divorce, that she cared deeply for her young children, worked hard to keep them dressed properly, and she had hopes of obtaining a high school education and seeing her children after being released. She was shown to be free of prior criminal involvement. The finding of an "ajbect failure" to prepare for the punishment phase is refuted by the trial record.

The motion court also found that "[f]amily, friends and coworkers were available and willing to testify [but] were not called upon to present testimony, and were not even contacted prior to trial." The motion court did not name these persons or precisely what they would have testified to had they been called. We are left to search the record to identify what friends, families, or coworkers were available, what they would have said if called, and then determine whether that testimony would have presented a viable defense during the punishment phase.

The record of the post-conviction proceeding discloses that the friends or family members who may have been available and willing to testify include defendant's sisters, Norma Wheeler and Elizabeth Lawson, her stepbrother, Joe Coslett, a brother-in-law, Stephen Lawson, and a baby-sitter for defendant's children, Ann Moentmann.

Norma Wheeler's testimony reflecting on defendant's character was mixed. She testified defendant had a falling out with her parents over an unpaid debt but defendant and defendant's stepmother had begun speaking to each other. Wheeler also testified that she loved her sister, although the two did not get along well growing up, probably because defendant was jealous of Wheeler, who was a better student. She testified that defendant was a good mother and that her life had value. Finally she testified that defense lawyers never talked

to her although she was available to testify.

Elizabeth Lawson testified that as a very young child defendant had been beaten by her natural mother, J.D. Wells' former wife. As a child defendant had been sent with her siblings to live in Ohio while the father and mother were going through their divorce. She also said that she would have testified to these matters and was available during the penalty phase of the trial.

Joe Coslett grew up with defendant and they enjoyed each other's company. He testified that she was always cheerful and he loved her. Although he lived in Texas before, during and after the trial, he would have come to Missouri to testify to these facts if he had been called and asked.

Ann Moentmann testified that she babysat defendant's children from February until September of 1987. She moved from Sedalia to North Dakota in November of 1987. She testified that defendant had her address. If called, she would have returned to Missouri to testify that defendant was "one of the best mothers" she had ever seen. She was not contacted by defense counsel.

As previously noted, defense counsel explained his reasons for not calling family members. Predominantly his reason for not calling family members was an express hostility by at least some of her siblings and step-siblings. He noted that those who maintained contact with defendant vacillated and would not talk to her. Eventually they quit visiting her in jail. Apparently, the motion court either discounted or disbelieved this explanation for failing to pursue family members as witnesses. The motion court concluded that defendant was prejudiced by failure to call these witnesses. Assuming, as we must, the outright rejection of defense counsel's explanations, the motion court's finding was not clearly erroneous on this point.

## K.

The motion court rejected several allegations in defendant's *pro se* and amended post-conviction motion.

### 1.

The motion court rejected the claim that counsel was ineffective in failing to request individual or small group *voir dire*. Defense counsel testified that he initially considered small group *voir dire* but decided not to pursue it. There was no error in finding counsel's decision to be a reasonable and professional decision. In addition, nothing in the record indicates that the panelists' responses were less than full, honest and candid. Defendant failed to establish prejudice.

### 2.

Defendant complains that the motion court should have found counsel ineffective in failing to present certain evidence. According to defendant there was readily available evidence that Hugo Twenter was responsible for the $3,000 debt. That evidence is less than compelling, viewed in light of the record.

The divorce decree provided that Hugo was to assume responsibility to pay "family bills incurred between October 20, 1979, through November 3, 1987." The $3,000 loan was made to defendant on September 21, 1987. J.D. Wells was not a party to the decree and accordingly was not legally bound to look to Hugo for repayment.

■ During the course of the trial, Hugo Twenter was asked if he was to repay the loan. Hugo replied, "It was never stated...." When defendant testified at trial, she was asked who was to repay the $3,000 debt. She replied, "I was." Counsel's decision to forego evidence may well have been based upon the questionable value of such evidence and that his own client admitted her obligation to pay the debt. In addition, the evidence of who was obliged to pay the debt did not establish a defense. At best, it served to impeach Hugo Twenter. Ordinarily, a defendant is not entitled to relief merely because defense counsel elects not to present evidence of dubious impeachment value. *Allbritton v. State*, 747 S.W.2d 687, 689 (Mo.App. 1988). The motion court was not clearly erroneous in failing to find counsel ineffective on this claim.

### 3.

■ The defendant complains that counsel was ineffective in failing to prove she was incapable of shooting the murder weapon. The problem with this claim is a total absence of evidence that the defendant could not shoot the weapon that caused the death of the victims. Speculation as to what an expert might have testified to does not establish ineffective assistance of counsel. *Kennedy v. State*, 771 S.W.2d 852, 857–58 (Mo.App.1989).

### 4.

■ Defendant believes the motion court was incorrect in failing to find counsel ineffective for not objecting to a demonstration at the trial. Defendant was asked to stand and hold the gun in front of her at arm's length. The demonstration was done in connection with evidence that the distance between the floor and the gunshot wounds in J.D. Wells' chest was fifty-two inches above the soles of his shoes and parallel to the floor. The demonstration indicated that defendant was tall enough to have inflicted the wound and was thus relevant. Nothing in the record suggests that its prejudicial effect outweighed its probative value. Thus it was admissible. *State v. Walls*, 637 S.W.2d 812, 814 (Mo.App. 1982). Counsel is not ineffective for failing to object to admissible evidence. *Downs v. State*, 789 S.W.2d 193, 196 (Mo.App.1990).

### 5.

Defendant asserts the motion court erred in failing to find counsel ineffective because counsel did not object to closing argument in which alleged misstatements of law occurred. According to defendant, counsel should have objected to argument by the state that the crime did not occur "in a heat of passion." As already discussed, no misstatement of law occurred that prejudiced the defendant. Accordingly, this claim of ineffective assistance fails.

### 6.

The motion court found no ineffective assistance of counsel for counsel's failure to present evidence relating to a search of

her waterbed by Lt. John Gordon on May 6, 1988, during which no cash register receipt was found. Defendant also takes issue with the motion court's finding that counsel was not ineffective in failing to prove the time that the television show known as "The Jeffersons" aired on the date of the murders.

### a.

At trial, Sgt. Lloyd Kerns of the Missouri Highway Patrol testified that he and Lt. John Gordon conducted a search of defendant's home on May 6, 1988, in search of a weapon. Kerns stated he did not look under the waterbed. A second search was conducted pursuant to a search warrant on May 7, 1988. The cash register tape was found underneath the waterbed mattress and mattress liner.

At the post-conviction hearing, Kerns' deposition was offered. It indicated that during the May 6 search, Kerns watched as Gordon lifted up the waterbed so that he could see six to eight inches underneath the waterbed. No weapon was observed by Kerns and nothing was seized from under the bed by Gordon. The prosecuting attorney testified that he interviewed Gordon shortly after the search and was told that Gordon had run his hand along between the railing and the mattress, but had not searched under the waterbed.

According to defendant, had the evidence of Lt. Gordon's May 6 search been presented, that "would have created a reasonable doubt as to how and when the evidence found its way under [defendant's] mattress." What the argument overlooks is that the evidence shows that the first search by Gordon was not thorough. The cash register tape was only found by physically lifting the mattress and looking under the liner, neither of which were done by Gordon. The motion court's finding that failing to develop this evidence was not ineffective assistance of counsel is not clearly erroneous.

### b.

The motion court found no ineffective assistance due to defense counsel's failure to present evidence that "The Jeffersons"

aired between 10:35 p.m. and 11:05 p.m. on May 4, 1988.

At trial a neighbor of the victims testified that she heard two shots between 9:30 and 11:30 p.m. while watching "The Jeffersons." No evidence was produced at trial showing what time the show aired. At the post-conviction hearing evidence was presented indicating that on May 4, 1988, "The Jeffersons" was played on the local television station between 10:35 and 11:05 p.m. Defendant claims that had that evidence been produced, it would have shown that defendant could not have killed her father between 10:35 and 11:05 p.m., taken her stepmother to a field eight miles distant, killed her stepmother, and driven seventeen miles home, arriving by 11:00 p.m. In reality the trial record reflects that defendant called Linda Turner at about 11:15 p.m. Defendant did not arrive at Linda Turner's house until about 11:30 p.m. Even if the precise time of J.D. Wells' murder was about 10:35 p.m., that would have given defendant ample time to do all the travelling necessary to arrive at home by 11:15 p.m. or at Linda Turner's home by 11:30 p.m. Producing the evidence would not have provided a viable defense. A sufficient time gap remained. Therefore, the motion court did not err in finding an absence of prejudice in failing to produce this evidence.

### L.

Defendant attempted to file a second amended motion for post-conviction relief more than five months after the last date for filing amended motions as permitted under Rule 29.15(f). Defendant does not attempt to give any rationale for the tardy filing, but argues the time limits are unreasonably short. The Court reiterates what it has said before; the time limits of Rule 29.15 are valid and mandatory. *Kilgore v. State,* 791 S.W.2d 393 (Mo. banc 1990); *Sloan v. State,* 779 S.W.2d 580 (Mo. banc 1989); *Day v. State,* 770 S.W.2d at 693. None of the circumstances such as existed in *Luleff v. State,* 807 S.W.2d 495 (Mo. banc 1991), or *Sanders v. State,* 807 S.W.2d 493 (Mo. banc 1991) are shown to

exist. The claim on this point is without merit.

## CONCLUSION

Other claims are made in the direct appeal regarding errors in instructions during the punishment phase. In addition, other claims are made asserting ineffective assistance of counsel during the punishment phase. The findings of ineffective assistance of counsel for failing to investigate and call family members in the punishment phase is supported by the evidence. Other claims relating to the punishment phase need not be addressed.

The extensive review of the issues above discloses no deficiency requiring a retrial on the issue of defendant's guilt. The only question remaining is whether this Court is to order a new trial on all issues or on punishment alone. The question is answered by statute:

> In addition to its authority regarding correction of errors, the supreme court, with regard to review of death sentences, shall be authorized to:
> (1) affirm the sentence of death; or
> (2) set the sentence aside and resentence the defendant to life imprisonment without eligibility for probation, parole, or release except by act of the governor; or
> (3) set the sentence aside and remand the case for retrial of the punishment hearing. A new jury shall be selected or a jury may be waived by agreement of both parties and then the punishment trial shall proceed in accordance with this chapter, with the exception that the evidence of the guilty verdict shall be admissible in the new trial together with the official transcript of any testimony and evidence properly admitted in each stage of the original trial where relevant to determine punishment.

*Section 565.035.5.*

The language of this statute is sufficiently broad to cover the situation now under consideration. It does not appear to apply only to direct appeals but to the entire gamut of procedures by which this Court reviews death sentences. That would include claims of ineffective assistance of counsel raised in a Rule 29.15 proceeding.

In allowing the Court to remand for a new punishment phase trial, § 565.035 promotes judicial economy by requiring a retrial only of the defective portion of the trial and avoiding needless relitigation of defendant's guilt.

Accordingly, the judgment in the direct appeal as to Count I is affirmed. That portion of the judgment in the Rule 29.15 proceeding setting aside the convictions is reversed. The sentence of death under Count II is set aside and the case is remanded for retrial for the purpose of assessing punishment on Count II as provided in § 565.035.5(3).

ROBERTSON, C.J., RENDLEN and COVINGTON, JJ., and HIGGINS and WASSERSTROM, Senior Judges, concur.

BLACKMAR, J., concurs in part and dissents in part in separate opinion filed.

BENTON and THOMAS, JJ., not participating because not members of the Court when case was submitted.

BLACKMAR, Judge, concurring in part and dissenting in part.

I concur in the portion of the principal opinion vacating the sentence and directing a new trial of the penalty phase. I do not disagree with the conclusion that there is no error in the initial appeal, but cannot vote to affirm the judgment of guilt because I believe that deference to the motion court's findings requires that the direction of a new trial of both the guilt phase and the penalty phase be affirmed.

The evidence presented a very convincing chain of circumstances pointing to the defendant's guilt. Yet there are problems and uncertainties. The evidence is purely circumstantial. One unexplained matter is how the defendant, 4 feet 11 inches tall and weighing 110 pounds, could have moved her much heavier mother from the home to a point eight miles distant, through a barbed wire fence, and 55 feet from the nearest road, by herself. If someone else were involved, that person might be the sole murderer. If the defendant committed one or more of the murders with the aid of another person, the jury might take that

circumstance into account in assessing deliberation and punishment. (It was not strictly necessary to the state's case to establish that the killings took place between 10:35 P.M., when "The Jeffersons" aired, and 11:15 P.M., when the defendant met Linda Turner, but I find the time analysis in the principal opinion somewhat less than persuasive.) The case presents aspects which should have been investigated, and the motion judge is well supported in his finding that the defendant did not have the kind of professional help that is appropriate for a case in which the death sentence is sought. Of course any conclusion about the effect of the omissions is speculative, but it cannot be said that a substantial challenge to the state's chain of circumstances would not affect the result.

The motion court conducted a hearing which produced a transcript of more than 800 pages. The judge then prepared a lengthy memorandum of his findings and conclusions. The memorandum shows that the judge was thoroughly familiar with *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and diligently applied the rule of that case to the evidence. He rejected the great majority of the defendant's claims of ineffective assistance, but found some nine grounds of ineffectiveness touching both the guilt phase and the penalty phase. I do not believe that his comprehensive findings can be so lightly brushed aside as "clearly erroneous."

Trial counsel did not even try to meet with members of the defendant's family, about evidence for the punishment phase or otherwise. He expressed his reasons as follows:

As I remember, that at the time there was—we—we really got conflicting stories as to the relationship between she and her other brothers and sisters. One of the things that concerned me was the fact that they had not, you know, been in constant contact or visited her that much while she was in the Pettis County Jail. And I—I know we talked with one sister. But I—I—I really—I don't remember.

It is not surprising that the motion judge felt that counsel's pretrial investigation fell short of the standards that should be expected in a death penalty case. He did not even try to talk to family members to see what they might have to say. He apparently assumed that they knew nothing helpful.

Testimony of family and friends is often adduced at the punishment phase of a capital trial. Here there are substantial indications that the defendant's natural sisters, Elizabeth Lawson and Norma Wheeler, her stepbrother Joe Coslett, and others who had known her, would have been willing to give testimony that might have helped her. Her counsel did not even bother to find out what they might have to say. That is the essence of his ineffectiveness at the penalty phase. Counsel admitted that he was surprised at the death verdict, and the court reasonably concluded that he had not given the punishment phase the advance consideration it deserved. Counsel testified that his penalty phase strategy consisted of emphasizing what he viewed as the mitigating factors in the case: the defendant's lack of a criminal record, her emotional troubles due to childhood abuse, and her good relationship with her children. Yet counsel called no family members or close friends, no one who could verify the defendant's story of childhood abuse, and no one who had seen the defendant interact with her children outside of counseling sessions. He hastily collected as witnesses only a psychological counselor who had seen the defendant several years earlier about problems with her children, a minister serving as jail chaplain who visited her occasionally, and the defendant. The case for finding ineffective assistance at the penalty phase is much stronger than was shown in *Kenley v. Armontrout,* 937 F.2d 1298 (8th Cir.1991).

Had counsel spoken with Lawson and Wheeler it is quite possible that he could have discovered evidence that would be helpful at the guilt phase also. Some of the most damaging testimony against the defendant was furnished by her stepsisters, Anna Laas and Clara Denker, each of whom said that she had overheard a telephone call in which the defendant said that both her father and her mother had been shot, at a time when only her father's body had been discovered. The testimony of

Wheeler and Lawson could have impeached Denker because she told them, long before the trial, that she was not in the room when the defendant made the call. The principal opinion seeks to excuse counsel's omission on the ground that counsel had no advance notice that the sisters would provide this impeaching information. But counsel's plain duty obliged him to conduct interviews in some depth with family members, and to probe the details of the family gathering following discovery of the father's body. The motion judge reasonably concluded that, had counsel done this, he would have obtained this valuable information. The effect of impeaching one of the two witnesses on a vital point is patent. Nor is it realistic, in a circumstantial case, to say that failure to obtain impeaching evidence may be considered only if it would produce a "viable defense." Anything tending to undermine a key circumstance would be important.

Failure to produce impeaching evidence may support a finding of ineffectiveness.[1] The cases listed in the principal opinion as to what must be shown in order to support a finding of ineffectiveness for failure to produce impeaching evidence are not appropriately cited, because all involve situations in which the trial court's findings of fact were sustained. They were not intended to circumscribe the authority of the trier of the fact to consider the entire record in determining whether counsel met prevailing standards of competence. The motion judge's finding of ineffectiveness in this respect is clearly supported by the evidence. The Court simply substitutes its judgment for his.

The same fault appears in the casual dismissal of the trial court's finding that counsel should have interviewed Mike Turner face to face. Turner shared a residence with the defendant (although his romantic involvements were apparently with others). He was the other party to the significant telephone call, and so his testi-mony would not be simply impeaching. He was close with his information when questioned by the police, but this is not surprising. He testified at the postconviction hearing that he feared he was a suspect and was very nervous. He also testified that the defendant arrived home at approximately 11:00 on the night of the murders, and denied that she told him on the phone that both her parents were dead. He stated that he did not tell counsel that he could not recall the conversation, but that, "I remembered the phone conversation. There was no problem remembering that." The motion judge credited Turner's testimony. The principal opinion usurps this determination of credibility and adopts counsel's characterization of Turner as "evasive" even though the motion judge found Turner not incredible. Even if Turner was uninformative over the telephone, counsel foreclosed any possibility of finding out further information when he limited himself to the telephone conversation. Any experienced lawyer knows that witnesses who are tight-lipped when interviewed casually or by telephone sometimes open up in a face-to-face interview with a skilled interviewer. There was a clear basis for concluding that Turner was a witness at the center of the scene who should have been spoken to directly. It is not appropriate to defend counsel by saying that there was no assurance that Turner would give different information in an interview, or that his information would likely change the result of the trial. The point is that counsel made no effort to get the information, and so was unable to make an informed strategic or tactical decision.

The motion judge faulted counsel for not pursuing information about Mr. Wells' "fencing" activities. Interviews with family members might very well have yielded helpful information. Counsel's duty in a circumstantial case is to suggest that others might have motives to commit the crime charged, and trial judges usually give counsel substantial leeway. The hackneyed cry of "red herring"[2] is not an ade-

---

1. *Bonner v. State,* 765 S.W.2d 286, 288 (Mo.App. 1988); *Trimble v. State,* 693 S.W.2d 267, 271–75 (Mo.App.1985).

2. A red herring is a dried fish which is dragged across a fox's trail in order to confuse hunting dogs. Diversion is a part of the adversary process.

quate answer to counsel's failure to investigate further. Nor am I prepared to believe that the somewhat casual and imprecise statement in *State v. Turner*, 623 S.W.2d 4 (Mo. banc 1981) was designed to overrule the carefully considered holdings of *Sutter v. Easterly*, 354 Mo. 282, 189 S.W.2d 284, 290 (Mo.1945) and *Osborne v. Purdome*, 250 S.W.2d 159, 163 (Mo.1952). *Turner* is adequately explained under the trial court's discretion to exclude evidence which is utterly lacking in probative value, and also by the absence of evidence of unavailability of the declarant. If corroboration is needed, repeated declarations should be adequate to supply it. To assert that counsel cannot be ineffective for failing to *offer* inadmissible evidence misses the point. Counsel was ineffective for failing to investigate the leads his client gave him. Counsel did not give the trial court the opportunity to rule on the evidence.

Other points in which the trial court found inadequacy provide further support for the finding of lack of diligence in investigation. Counsel described Robert Fox as a witness he would very much like to talk to. The motion judge found that Fox was readily available during the period immediately following the killings. The presence of a man with a gun in the victims' driveway should have been a circumstance of interest to counsel facing the task of defending Virginia Twenter. The circumstance of Fox's changing his story so as to have seen the armed man the evening before the murders does not destroy the usefulness of the testimony. Any recent stalking of Wells would have been of interest to the jury. Fox's statement to the police, given shortly after the murders, would have been admissible in evidence had he been called, and seems to be much more credible than his later testimony. Had the motion court found no indicia of incompetence in failing to interview or to produce Fox its finding would undoubtedly be affirmed, but the evidence did not mandate such a finding.

The motion court found incompetence in the failure to provide an expert witness about the shoeprints. This was not the fault of trial counsel, who wanted the expert, but of the public defender system, which refused to provide the necessary funds. Counsel is furnished by this system, and so delinquencies in the system may be the basis for a finding of incompetence. The suggestion that this point should be raised as a part of the initial appeal is hypertechnical, and unsound under our decisions, for both the initial appeal and the PCR appeal are now before the Court. We invite presentation in this manner by holding that points touching competence of counsel cannot be raised in the initial appeal under any circumstances, and that *Rule 29.15* is exclusive as a method for arguing incompetence. *State v. Wheat*, 775 S.W.2d 155 (Mo. banc 1989).[3] Nor is it a sufficient answer to say that there is no evidence about what the hypothetical expert would say. No expert has apparently been furnished for the posttrial proceedings and so it would be impossible to present an offer which meets the standards of the principal opinion. The fault lies in denying defense counsel the opportunity to consult with the expert in the preparation of the case. *See Little v. Armontrout*, 835 F.2d 1240 (1987), *cert. denied* 487 U.S. 1210, 108 S.Ct. 2857, 101 L.Ed.2d 894 (1988).

A word is appropriate about the failure of the defendant's initially appointed counsel to provide assistance after the preliminary hearing, and the delay in providing trial counsel, so that the defendant did not see trial counsel until at least four months after she was incarcerated. Initial counsel's attitude was described by a representative of the state public defender's office as "hostile and uncooperative." He said that he would function at the preliminary hearing, at which he did not propose to introduce evidence,[4] and would do nothing more. The defendant indicated two possible witnesses in Warrensburg, identified as Robert Arnell and Steve. They apparently did not have deep roots in the Warrensburg or Sedalia areas, and trial counsel probably

---

**3.** A very unwise decision, in my opinion, which should be overruled as soon as possible.

**4.** I do not fault this decision, which accords with prevailing practice.

did as much as he could to find them. Maybe they do not exist. Maybe the defendant never went to Warrensburg. But, if such witnesses are to be found at all, they should be sought promptly. Robert Fox, also, might have been located and secured as a witness by prompt investigation. We cannot be proud of a system which does not make counsel available promptly to pursue the leads the imprisoned capital defendant provides.

The pervasive fault in the principal opinion is that it attacks each separate item of the motion judge's finding of incompetence, considers that item in isolation, concludes that it is not sufficient to justify the abortion of the trial on the merits, and therefore pronounces the decision "clearly erroneous." The transcript and the motion judge's findings show a lack of diligence of counsel in failing to secure the information necessary to support an informed judgment. The very repetition of the instances of failure to pursue leads supports the finding. The trier of fact is entitled to form a judgment from the whole record, which we should be loath to displace.

What has just been said applies with all the greater force to a circumstantial case. Just as the circumstances relied on by the prosecution should not be viewed in isolation, so the defense must have reasonable latitude in countering the prosecution and in presenting circumstances which may raise doubts. The motion court is clearly supported in concluding that defense counsel was remiss in his search for circumstances which might possibly be helpful.

Criminal defendants are entitled to effective counsel. We provide a posttrial procedure in which new counsel are appointed. It is always a temptation for appellate judges to think that a circuit judge, or a jury, is clearly erroneous in findings and conclusions, simply because the writer of the opinion would have decided the facts otherwise. But we should resist that temptation. It is for the motion court, and not for us, to resolve doubts about the evidence. The principal opinion departs from the recent holding in *State v. Wells*, 804 S.W.2d 746 (Mo. banc 1991), that a single failure to produce just one significant piece of evidence may support a finding of ineffectiveness. This case sends the wrong signal to trial judges in postconviction proceedings, by indicating that their conclusions, if favorable to the defendant, will face exhaustive appellate scrutiny. It stands out in sharp contrast to *Wilson v. State*, 813 S.W.2d 833 (Mo. banc 1991), in which this Court rubber-stamped the postconviction judge's findings and conclusions, in spite of infirmities apparent on the face.

I would affirm the order of the 29.15 court and would remand for a new trial of the guilt and the penalty phases.